**KINNETT DAIRIES, INC.,**
**Plaintiff-Appellee,**

v.

**J. C. FARROW, etc., et al.,**
**Defendants-Appellants,**

**Flav-O-Rich, Inc., Intervenor-Appellant.**

No. 77–3374.

United States Court of Appeals,
Fifth Circuit.

Sept. 29, 1978.

Rehearing Denied Oct. 26, 1978.

---

**16.** *See* Note 8, *supra.*

Richard A. Gladstone, John F. Sherlock, William S. Glading, Mark F. Evens, Anthony J. Steinmeyer, Dept. of Justice, Washington, D. C., for Federal appellants, J. C. Farrow.

James E. Humes, Albert W. Stubbs, Columbus, Ga., for plaintiff-appellee.

Before WISDOM, GOLDBERG and RUBIN, Circuit Judges.

GOLDBERG, Circuit Judge:

This appeal from the grant of a preliminary injunction prohibiting performance of a government contract by a large business concern raises a series of issues relating to the regulations governing the set-aside of certain military procurements for bidding restricted to small business concerns.

While the questions most directly placed before us are the proper interpretation of a procurement regulation and the permissibility of certain management techniques in procurement actions pursuant to that regulation, we are more fundamentally called upon to consider the proper scope for court involvement in the military procurement process and to determine how competing government policies may be harmonized. Our task is to effectuate, within the parameters of the regulatory command, the stated policy of insuring that a fair proportion of government purchases and contracts be placed with small business enterprises while simultaneously permitting the government to procure goods at reasonable and competitive prices, also a stated policy. This task is not a simple one; we are required to navigate through a tortuous record and a maze of interrelated regulations with neither a detailed roadmap nor a reliable compass. We begin with a review of the rather complex litigative history of the case now before us.

I.

The present suit arises from the solicitation and subsequent award of contracts for milk and ice cream to be supplied to Fort Benning, Georgia, for a period of six months commencing December 1, 1977. The solicitation, No. DLA 13H–78–B–0048 (hereinafter Solicitation 0048), was issued [1] on October 6, 1977, and invited bids on four designated groups of milk and ice cream products. This lawsuit chiefly concerns only two of the four groups, Group II (milk for resale by the post exchange and commissaries) and Group IV (ice cream for resale by the post exchange and commissaries).[2] Groups II, III, and IV were solicited on an unrestricted basis, meaning that any business, regardless of its size, could compete for the contracts. Group I was set-aside, or restricted, for exclusive participa-

---

1. Solicitation 0048 was issued by the Defense Personnel Support Center of the Defense Logistics Agency (DLA), part of the Department of Defense. DLA was formerly known as the Defense Supply Agency (DSA).

2. Contracts for Group I (troop issue milk) and Group III (troop issue ice cream) were subsequently awarded to plaintiff, Kinnett Dairies, Inc., and are not in dispute here.

tion by small business concerns.[3] During the bid process, eight firms were solicited, of which five were small businesses. The DLA received three bids on Groups I, III, and IV and five bids on Group II.

Bids were opened on November 1, 1977. Kinnett Dairies, Inc. (Kinnett), a small business concern, submitted the low bids on Groups I and III, while Flav-O-Rich, Inc. (Flav-O-Rich), a large business, submitted the low bids on Groups II and IV.[4] Contracts were awarded to the low bidders on November 8, 1977.

Ten days after the contracts were awarded,[5] Kinnett initiated an action in federal district court challenging the basis of Solicitation 0048 with respect to Groups II and IV. Kinnett contended that bidding on these groups should have been limited to small business concerns and claimed that the government had acted arbitrarily, capriciously, and without legal foundation in failing to restrict the solicitation. Kinnett's complaint named the United States and various government officials as defendants and, requesting a temporary restraining order and preliminary and permanent injunctive relief, sought (1) to prohibit defendants "from awarding to and contracting with the successful low bidder, Flav-O-Rich, for the supply or delivery of any or all dairy products as required by Groups II and IV" of Solicitation 0048, (2) to vacate the determination that bids on Groups II and IV be solicited on an unrestricted basis, and (3) to order the award of Groups II and IV to the low small business bidder (Kinnett) on Solicitation 0048. Kinnett further sought to enjoin defendants from considering certain factors[6] in future procurement decisions under the Armed Services Procurement Regulations (ASPR), as well as declaratory and other relief.

The district court denied Kinnett's application for a temporary restraining order, noting that performance of the contract would not begin until December 1, but scheduled a hearing on the application for a preliminary injunction for November 28. A hearing was held on that date, at which time Flav-O-Rich was permitted to intervene in the action. At the conclusion of the hearing the court indicated its intention to enjoin the performance of the contract. The court entered its written Judgment the following day, restraining and enjoining the government defendants and intervenor Flav-O-Rich from performing the contracts identified as Groups II and IV of Solicitation 0048 or paying the contract price of said contracts, "pending the final hearing and determination of this case . . .." The district court filed accompanying findings of fact and conclusions of law, also on November 29, 1977. Both the government and Flav-O-Rich filed notices of appeal.

The district court denied motions to stay the issuance of its preliminary injunction.

---

**3.** Authority for restricting invitations for bids (or solicitations) to small businesses, or inviting bids on an unrestricted basis (*i. e.,* permitting submission of bids by interested business concerns regardless of their size), is provided by the Small Business Act, 15 U.S.C. § 631 *et seq.* (1976), and the Armed Services Procurement Act, 10 U.S.C. § 2301 *et seq.* (1976).

**4.** The low bidders and the value of their bids were as follows:

| Group | Solicitation Basis | Low Bidder | Value* |
|---|---|---|---|
| I | Small Business Set-Aside | Kinnett | $702,157.80 |
| II | Unrestricted | Flav-O-Rich | 887,749.10 |
| III | Unrestricted | Kinnett | 87,622.00 |
| IV | Unrestricted | Flav-O-Rich | 106,407.43 |

*These values do not reflect discounts available to the government for prompt payment.

**5.** No protest concerning Solicitation 0048 was lodged with the government contracting officer, with the General Accounting Office, or with the courts prior to the awarding of contracts.

**6.** The allegedly illegitimate factors enumerated in Kinnett's complaint include:

(1) Price spread between the bids of participating small business concerns;

(2) Price spread between the bids of large business concerns and small business concerns; and

(3) Geographic proximity of a small business concern to the military installation to be supplied under the terms and conditions of a solicitation.

On December 5, 1977, this court, per Judge Rubin, granted a stay of the injunction issued by the district court during the pendency of this appeal. The stay was expressly conditioned on Flav-O-Rich's execution of a bond designed to make Kinnett whole should Kinnett prevail on appeal. A bond for $100,000 was subsequently executed, and Flav-O-Rich has proceeded to perform on the contracts as awarded.

The instant appeal is from the district court's order granting a preliminary injunction on the ground that the government defendants "have misconstrued and misinterpreted" relevant procurement regulations and "have acted arbitrarily, capriciously and contrary to the true spirit and intent" of regulatory and statutory provisions. The underlying controversy between Kinnett and the government, however, is a continuing one, in which this case represents the third skirmish.

Prior to late 1976, solicitations for dairy products at Fort Benning had been conducted entirely on a set-aside basis for a number of years. All of Fort Benning's requirements during that period were supplied by Kinnett, a Columbus dairy located some eleven miles from the base. Beginning with Solicitation No. DSA 13H–76–B–8570 (hereinafter Solicitation 8570), issued on August 31, 1976, to cover the procurement period commencing December 1, 1976, bids were invited on an unrestricted basis for certain procurement groups.[7]

Facing competition from large businesses for the Fort Benning procurement for the first time, Kinnett filed a protest with the General Accounting Office (GAO), pursuant to ASPR 2–407.8, 32 CFR § 2–407.8, contending that the invitation for bids should have been limited in its entirety to small businesses, as was the case with prior solicitations. While the protest was pending, the bids were opened, revealing low bids on Group I by Dempsey Brothers, a small business, on Group II by Flav-O-Rich, and on Groups III and IV by Kinnett. Although it was the low bidder in two of the categories, Kinnett filed an action in federal district court seeking to restrain and enjoin the United States from awarding the contracts. *Kinnett Dairies, Inc. v. Greenberg,* Civil Action No. 76–121–COL (M.D.Ga.) (hereinafter referred to as the *Greenberg* litigation).

On November 24, 1976, the district court granted Kinnett's motion for preliminary relief enjoining the United States from awarding the contract on Group II to Flav-O-Rich. The court's Order expressly provided that preliminary injunctive relief would continue in effect with respect to Group II "until further order of the Court after the Comptroller General has acted, or stated he will not act on the administrative appeal filed with him by Plaintiff in this matter . . .."

Several months later, the Comptroller General issued a decision denying Kinnett's protest in the administrative appeal. *Kinnett Dairies, Inc.,* No. B–187501 (March 24, 1977). By that time, contracts on Solicitation 8570 had long since been awarded[8] and the procurement period had largely run its course. As a result of the district court's preliminary injunction, the low bidder on Group II, Flav-O-Rich, was precluded from

---

7. Solicitation 8570 was initially issued on an unrestricted basis for all four groups and was later amended to set-aside Group I for exclusive small business participation. Both subsequent solicitations, Nos. 8600 and 0048, set-aside Group I and invited bids on an unrestricted basis for Groups II, III, and IV.

8. Contracts were awarded to Kinnett for Groups III and IV and to Dempsey for Group I.

Group I was actually performed by Kinnett pursuant to a subcontract between Kinnett and Dempsey. No contract was awarded on Group II; instead, Fort Benning's requirements for "resale milk" were supplied under a non-competitive blanket purchase agreement performed by Kinnett. Thus, all of Fort Benning's milk and ice cream requirements during the period covered by Solicitation 8570 were supplied by Kinnett.

making anticipated sales of $758,085.46 to Fort Benning.[9]

The second round in the Kinnett-government dispute erupted on April 4, 1977, with the issuance of Solicitation No. DSA 13H–77–B–8600 (hereinafter Solicitation 8600), which once again invited bids on Groups II, III, and IV on an unrestricted basis. Once again Kinnett went to court,[10] this time without the intermediate step of filing a protest with the GAO, and once again the district court enjoined the government from awarding any contract on the disputed competitions. It is worth noting that the court's Order of April 27, 1977, made no reference to the Comptroller General's decision of March 24, denying Kinnett's earlier protest.[11]

In response to the court's decree, the government cancelled those provisions of Solicitation 8600 relating to Fort Benning's Group II requirements. Bids in the other groups of Solicitation 8600 were opened on May 10, 1977; Kinnett Dairies proved to be the successful low bidder and was awarded the contracts for Groups I, III and IV. Moreover, Kinnett again supplied Fort Benning with its Group II requirements under a non-competitive blanket purchase agreement.

On August 11, 1977, the district court, *sua sponte,* dismissed the *Greenberg* case as moot, specifically noting and rejecting the government's request for "a definitive ruling on the Plaintiff's request for permanent injunction because of the possibility of future litigation of this same nature" so that the government would have the opportunity to appeal. Accordingly, no ruling on Kinnett's request for permanent injunctive relief was ever made in the *Greenberg* case.

The government's decision to invite bids on an unrestricted basis for Groups II, III, and IV of Solicitation 0048, issued on October 6, 1977, then set in motion the events bringing this case before us on appeal.

## II.

Several preliminary questions must be resolved before reaching the merits in this case. Two initial barriers to our consideration of this appeal, standing and mootness, may be quickly surmounted.

■ It is by now well settled in this Circuit that unsuccessful bidders for government contracts may have standing to invoke judicial review of procurement decisions. *Hayes International Corporation v. McLucas,* 509 F.2d 247, 254–58 (5th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975) (adopting the approach taken by the D.C. Circuit in its pathbreaking decision in *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970)). The question in each case is whether the disappointed bidder passes the twin tests of demonstrating "injury in fact" and asserting an interest "arguably within the zone of interests to be protected or regulated" by the statute or regulation in question. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Hayes International, supra,* 509 F.2d at 254–56. We have no doubt that Kinnett has satisfied these requirements in the instant case. The "injury in fact" is the same as that found sufficient in *Hayes International.* Furthermore, the interests Kinnett seeks to protect as a small business are clearly within the "zone of interests"

---

**9.** Flav-O-Rich was not a party to the *Greenberg* litigation. The government, which was a party, filed notice of appeal of the district court's November 24, 1976 Order but voluntarily dismissed its appeal "with prejudice" on April 11, 1977, shortly after issuance of the Comptroller General's decision and three weeks prior to termination of the procurement period. At the time the government dismissed its appeal, the district court had taken no action to modify its November 24 Order in response to the Comptroller General's action on the Kinnett protest.

**10.** These proceedings constituted a continuation of the earlier *Greenberg* litigation.

**11.** The parties vigorously contest whether the district court has accorded appropriate deference to the GAO decision throughout this litigation. In the proceedings below regarding Solicitation 0048, the judge stated from the bench, "Yes, we had the benefit of the GAO order when the Court entered its order back in April of 1977."

protected by the Small Business Act, 15 U.S.C. § 631 *et seq.*, and the implementing regulations here at issue, ASPR 1–700 *et seq. Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080, 1086 (6th Cir. 1975); *Ray Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696, 701 (5th Cir. 1973). Accordingly, we hold that Kinnett has standing to challenge the instant procurement decision.[12]

■ The question of mootness arises because the solicitation governed by the district court's preliminary injunction has run its course. However, the history of this controversy reveals the reasonable expectation—indeed, the near certainty—that the act complained of will be repeated.[13] This case is a paradigm of the situation "capable of repetition yet evading review." In virtually identical circumstances, we have concluded that a real controversy exists and that the appeal may proceed. *Ray Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696, 701 (5th Cir. 1973). *See Morial v. Judiciary Commission of the State of Louisiana,* 565 F.2d 295, 297 n.3 (5th Cir. 1977) (en banc). Furthermore, in this case, liability on the bond executed by Flav-O-Rich as a condition to this court's stay pending appeal remains to be adjudicated. The case is not moot.

One additional preliminary matter requires brief attention. As already noted, this case reaches us as an appeal from the grant of a preliminary injunction. The criteria governing the grant of a preliminary injunction by the district court are, of course, quite familiar. *See, e. g., Compact Van Equipment Co., Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952 (5th Cir. 1978);

*State of Texas v. Seatrain International, S.A.,* 518 F.2d 175 (5th Cir. 1975); *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567 (5th Cir. 1974). Here appellants, in addition to contending that Kinnett failed to establish a substantial likelihood of success on the merits, raise serious doubts as to whether Kinnett carried its burden on the remaining three prerequisites for preliminary injunctive relief. Appellants contend that Kinnett failed to present evidence demonstrating (1) that it would suffer irreparable injury absent the preliminary injunction or (2) that any threatened injury to Kinnett outweighed the damage the preliminary injunction might cause to Flav-O-Rich. Appellants also argue that no consideration was given to the public interest in the orderly administration of the government procurement process or to the public interest in avoiding the unnecessary expenditure of public funds for goods available to the government at a lesser price.

Kinnett, while contending that all four prerequisites to the grant of a preliminary injunction were met in this case, argues more fundamentally that the stay granted by this court, together with the expiration of the procurement period in question, eliminated the injunctive feature from the case, reducing the task before this court to a simple decision on the merits.[14]

We find it unnecessary to resolve this question. Kinnett recognizes that an adverse decision on the merits is dispositive of its case. In view of our determination that Kinnett did not carry its burden on the merits, we need not consider whether, were

**12.** While Supreme Court decisions subsequent to *Hayes International* have in some respects put a new gloss on standing doctrine, *see Warth v. Selden,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), we find nothing in those decisions, or in the circumstances of this case, requiring any thoroughgoing re-examination of the approach adopted in *Hayes International. See Pacemaker Monitor Corporation v. United States Government,* 440 F.Supp. 473, 481–85 (S.D.Fla.1977); *Union Carbide Corp. v. Train,* 73 F.R.D. 620, 622–24 (S.D.N.Y.1977).

**13.** The district court's conclusions of law in this case include a statement that government defendants' actions and stated intentions "[raise] an inference that the conduct here complained of will continue in the future." (Conclusion 3).

**14.** Kinnett does not argue that the injunction granted below was tantamount to a final injunction and should be reviewed as such, without consideration of prerequisites limited in their applicability to preliminary relief.

Kinnett correct on the merits, it would also be required to demonstrate its satisfaction of the remaining prerequisites to preliminary injunctive relief in order to prevail on appeal. Nor do we pass on the validity of the district court's findings and conclusions with respect to irreparable injury, balancing of harms, or the public interest. Of course, were our resolution on the merits different, or were there a possibility that the injunction would itself have effect following resolution of this appeal, we would be obliged to consider questions which we today leave open.

### III.

The procurement regulation[15] at the heart of this appeal is ASPR 1–706.5(a)(1), which provides that

> Subject to the order of precedence established in 1–706.1(a), the entire amount of an individual procurement or a class of procurements, including but not limited to contracts for maintenance, repair, and construction, shall be set aside for exclusive small business participation (see 1–701.1) if the contracting officer determines that there is reasonable expectation that offers will be obtained from a sufficient number of responsible small business concerns so that awards will be made at reasonable prices. Total set-asides shall not be made unless such a reasonable expectation exists. (But see

1–706.6 as to partial set-asides.) Although past procurement history of the item or similar items is always important, it is not the only factor which should be considered in determining whether a reasonable expectation exists.

This regulation is designed to implement the objective, set forth in the Small Business Act[16] and the Armed Services Procurement Act[17], that a fair proportion of government purchases and contracts be placed with small business concerns.

Kinnett's central contention focuses on a single clause of ASPR 1–706.5(a)(1), providing that a procurement shall be set aside "if the contracting officer determines that there is reasonable expectation that offers will be obtained from a sufficient number of small business concerns so that awards will be made at reasonable prices." Kinnett maintains that the *sole* determination to be made by a contracting officer considering a set-aside "is whether there is a reasonable expectation that *offers will be obtained from a sufficient number of responsible small business concerns.*" Appellee's Brief at 5. According to Kinnett, the succeeding clause of the regulation, ". . . so that awards will be made at reasonable prices," is merely "a statement of the result anticipated," to which no independent effect is to be attributed. *Id.* With specific respect to Solicitation 0048, Kinnett argues that the government has

**15.** ASPR regulations "have the force and effect of law." *M. Steinthal & Co. v. Seamans*, 147 U.S.App.D.C. 221, 231, 455 F.2d 1289, 1299 (1971) and cases cited therein.

**16.** 15 U.S.C. § 631 provides in part:
Declaration of Policy
 (a) The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government

should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the over-all economy of the Nation.

**17.** 10 U.S.C. § 2301 provides:
Declaration of Policy
It is the policy of Congress that a fair proportion of the purchases and contracts made under this chapter be placed with small business concerns.

contended neither that the potential small business bidders were not responsible nor that there was not a sufficient number of potential small business bidders. Because the government instead gave consideration to whether a reasonable and competitive price could be expected, Kinnett maintains that the decision not to set aside Groups II, III, and IV violated the regulatory mandate.

Kinnett also argues that the government contracting officer, J. C. Farrow, acted arbitrarily and capriciously in his decision to consider certain specific factors relating to price. While this argument is interwoven with Kinnett's basic position regarding the interpretation of ASPR 1–706.5(a)(1), we can extract the thread of an independent contention that even if the government's interpretation of the regulation is correct and factors other than the expected number of small business bidders may be considered, the contracting officer's reliance on certain specified factors in this case was arbitrary and capricious.

■ The district court agreed with both Kinnett's interpretation of the regulation and with Kinnett's contention that the contracting officer's consideration of certain factors was arbitrary and capricious. The court's adoption of Kinnett's position was embodied in numerous findings of fact and conclusions of law.[18]

The critical findings of fact for our consideration [19] are Finding 20, to the effect

---

**18.** The embodiments of plaintiff's contentions were in many instances rather literal ones. Of the 31 so-styled findings of fact entered by the district court, at least 25, including several of the most vigorously controverted findings, adopt allegations from Kinnett's complaint either verbatim or with minor verbal or grammatical modifications. A number of other findings and conclusions track the language of plaintiff's complaint in substantial part.

We recognize the time pressure imposed on a busy district judge faced with an emergency matter, and note that the court below did not adopt the allegations of plaintiff's complaint *in toto. Cf. Louis Dreyfus & Cie. v. Panama Canal Co.,* 298 F.2d 733, 738–39 (5th Cir. 1962). Nevertheless, as we have often stated, " 'findings and conclusions which represent the independent judicial labors and study of the district judge are more helpful to this Court.' " *Railex Corporation v. Speed Check Co.,* 457 F.2d 1040, 1042 (5th Cir. 1972), *quoting Kinnear-Weed Corp. v. Humble Oil & Refining Co.,* 259 F.2d 398, 401 (5th Cir. 1958).

The standard of review applicable to a trial court's factual findings is, of course, the "clearly erroneous" standard, whether the findings were prepared by the judge or developed by one of the parties and mechanically adopted by the judge. *Railex, supra; Louis Dreyfus, supra.* "When substantial evidence supports a finding, the finding will not be held clearly erroneous merely because the expression of the finding was adopted from a proposal by counsel." *Louis Dreyfus, supra* at 739. We have, however, recognized that "there is and should be a certain leeway in applying the standard to varying cases." *Id.* at 738. Where there is a general pattern of substantially verbatim adoption of one party's proposed findings (or, as here, allegations in a complaint or other pleading) and the evidence supporting the decision is of a doubtful nature, the record

must be examined with special care on controverted points. *See generally James v. Stockholm Valves & Fittings Co.,* 559 F.2d 310, 314 n.1 (5th Cir. 1977) *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

**19.** Judging from the written findings of fact, the district court apparently proceeded in part on the basis of a fundamental misperception of the government's case. The court apparently believed that a central element in the government's argument was the contention that small business bidders whose bids could not be expected to be reasonable and competitive were not *responsible,* and that the absence of a sufficient number of *responsible* bidders, so-defined, was the basis for the contracting officer's decision not to set-aside the solicitation in its entirety. *See* Findings 19, 20. In this respect, the court may have been misdirected by the allegations in plaintiffs' complaint, for we find nothing else in the record to support this interpretation of the government's position. Indeed, the record demonstrates conclusively that the government's professed basis for the set-aside decision was the absence of a reasonable expectation that the contracts could be awarded at a reasonable and competitive price. The government nowhere challenges the *responsibility* of potential small business bidders.

In any event, the district court made a number of findings relevant on its view of the case. These include findings that the basis of defendants' determination to solicit Groups II, III, and IV of Solicitation 0048 on an unrestricted basis "was that the small business bidders were not responsible" (Finding 19); that Kinnett and other small businesses "are unable to competitively bid with large businesses in an 'unrestricted' bid procedure" (Finding 5); that defendants' decision to solicit invitations to bid on an unrestricted basis "had a chilling, de-

that defendants' set-aside determination ". . . was based on their belief that in prior bid periods no small business bidders were within Defendants' acceptable 'price spread' as the Defendants compared 'price spreads' not only between small businesses, but between large and small business as well";[20] Finding 21, that another factor taken into consideration by defendants in their set-aside determination was the "alleged fact" that "Kinnett enjoys a distinct, unfair competitive advantage over other small businesses because Kinnett is located closer to Fort Benning than other small business"; and Finding 24, which we reproduce in pertinent part:

Defendants have acted arbitrarily, capriciously, erroneously and without legal foundation in concluding that the aforementioned price spread in successful bids and those bids of Kinnett on prior contracts which Plaintiff has served, and is now serving, establishes an absence of responsible small business bidders, and have also acted arbitrarily, capriciously, erroneously and without legal foundation in considering the physical location of the plant of Kinnett in making the determination to solicit bids on an unrestricted basis.

Defendants further have acted arbitrarily, capriciously, erroneously and without legal foundation in comparing price spread differential between bids submitted by successful and unsuccessful small business bidders on prior solicitations and in comparing price spread differential between bids submitted by large businesses and those bids submitted by

small business concerns on Group II, Solicitation DSA 13H–76–B–8570 (Contract Period December 1, 1976 through May 31, 1977—Fort Benning, Georgia) to determine that there is no reasonable expectation that offers on the current solicitation DLA 13H–78–B–0048 could have been obtained in response to invitation to bids if said solicitation had been set aside for small businesses.

The court also found that the government defendants' construction and application of ASPR 1–706.5(a)(1) was "arbitrary, capricious, and contrary to the true spirit and intent of said Regulation and the provisions of the Aid to Small Business Act." (Finding 28). Each of these findings adopts, with only minor modifications, allegations in the plaintiff's complaint. With minor exceptions, each is challenged, to a greater or lesser degree, by the government and by Flav-O-Rich on this appeal.

In appealing from the district court's interpretation of ASPR 1–706.5(a)(1) and its finding that the government contracting officer acted arbitrarily and capriciously, the government does not dispute the district court's finding that factors other than the number of responsible small business concerns expected to respond to Solicitation 0048 were considered in the set-aside determination. Indeed, the Government Brief specifies six factors alleged to have been taken into account in the contracting officer's decision.[21] Instead, the government argues that while procurements may be contracted with small businesses at higher prices to the government than those otherwise attainable through unrestricted com-

---

structive impact on the willingness of responsible small businesses to submit bids and to compete for the award of said resulting contracts," and that "[m]ore small businesses would have submitted bids if said solicitation had been restricted to small businesses" (Finding 23). All of these findings are closely modelled on allegations in plaintiffs' complaint, and all are challenged by appellants as wholly unsupported by, if not contradicted by, the record.

Our examination of the record compels the conclusion that Finding 19—that the set-aside determination was based on an absence of *responsible* small business bidders—is clearly er-

roneous. With respect to the remaining contested findings specified above, our framing of the issues on this appeal differs from that of the district court, and our analysis is not dependent on these findings. Accordingly, for purposes of this appeal, we need not pass on the existence of an adequate evidentiary basis to support these findings of the district court.

**20.** The "price spread" concept is discussed at length in Section VI, *infra*. *See* footnote 32, *infra*, for a definition of this concept.

**21.** These factors, including the price spread concept, are specified and discussed in Section VI, *infra*.

petition, the prices at which awards are made must in fact be reasonable *and* must be arrived at through "adequate" or "sufficient" competition. Determinations under ASPR 1–706.5(a)(1) concerning both price reasonableness and whether adequate competition may reasonably be expected are, in the view of the government, basically business judgments requiring the exercise of broad discretion by the contracting officer. This argument is essentially congruent with the analysis adopted by the Comptroller General in rejecting Kinnett's protest on Solicitation 8570.

Central to this line of reasoning is an interpretation of ASPR 1–706.5(a)(1) which gives independent effect to the clause, ". . . so that awards will be made at reasonable prices." This interpretation permits the contracting officer to consider, as part of his set-aside determination, whether the anticipated competition will be "adequate" or "sufficient" and will result in reasonable and competitive prices to the government. Use of the price spread concept is justified as an instrument for determining the likelihood of reasonable and competitive prices.

We perceive the issue before us as requiring a two-part inquiry. First, we must determine whether the government's construction of ASPR 1–706.5(a)(1) as permitting, if not necessarily requiring, the contracting officer to consider whether prices resulting from a set-aside solicitation will be reasonable and competitive, as a factor independent of the number of small business concerns expected to submit bids, is "a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Limited v. Warner,* 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973). Second, assuming that the government's interpretation of the regulation is a tenable one, we must examine whether the contracting officer's application of the price spread concept and other specified factors is in this case arbitrary, capricious, and without rational basis. *See id.*

## IV.

Before specifically addressing these issues, it is important that we make clear the scope of review of an agency's interpretation and application of its own regulations. We are convinced that the general caution to "reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress" or "improperly intrud[ing] into the agency's decision-making process . . . ," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), has special force in the context of government procurement.

The Supreme Court has repeatedly stated that although an agency interpretation may not be the only one permitted by the language of a provision, if the agency interpretation is a reasonable one, the courts must respect it. *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965). "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Id.* at 16, 85 S.Ct. at 801. *See also Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 1479–80, 1485, 43 L.Ed.2d 731 (1975); *Allen M. Campbell Co. General Contractors, Inc. v. Lloyd Wood Construction Co., Inc.,* 446 F.2d 261 (5th Cir. 1971) (When an agency interpretation "obviously incorporates quasi-technical administrative expertise and a familiarity with the situation acquired by long experience with the intricacies inherent in a comprehensive regulatory scheme, judges should be particularly reluctant to substitute their personal assessment of the meaning of a regulation for the considered judgment of the agency. If the agency interpretation is merely one of several reasonable alternatives, it must stand even though it may not appear as reasonable as some other." *Id.* at 265).

These pronouncements are particularly relevant in the procurement area. We have previously recognized the " 'strong public interest in avoiding disruptions in procure-

ment, and for withholding judicial interjection unless it clearly appears that the case calls for an assertion of an overriding public interest "in having the agencies follow the regulations which control government contracting." ' " *Hayes International Corp. v. McLucas,* 509 F.2d 247, 258 (5th Cir. 1975), *quoting M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 232, 455 F.2d 1289, 1300 (1971). This recognition flows from our awareness that judges are ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments "better left to the expertise of an executive agency . . ." *Hayes International, supra* at 258.

The District of Columbia Circuit, our sister circuit with the widest experience in adjudicating challenges to government procurement decisions, has evolved standards designed to guide determinations in this delicate area. In the *M. Steinthal* case, *supra,* the court cautioned that

In the field of government procurement the courts must be sedulous to heed the admonition that their authority to vacate and enjoin action that is illegal must be exercised with restraint less the courts fall into the error of supposing that they may revise 'action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available.'

147 U.S.App.D.C. at 230–231, 455 F.2d at 1298–99, *quoting Calcutta East Coast of India and East Pakistan/USA Conference v. Federal Maritime Commission,* 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968).

"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulation." 147 U.S.App.D.C. at 233, 455 F.2d at 1301. "Only when the court concludes that there has been a clear violation of duty by the procurement officials should it intervene in the procurement process and proceed to a determination of the controversy on the merits." *Id.* at 235, 455 F.2d at 1303. *See also Scanwell, supra,* 137 U.S.App.D.C. at 386, 424 F.2d at 874; *Wheelabrator Corporation v. Chafee,* 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971).

The D.C. Circuit has also stressed the role of the General Accounting Office, with its accumulated experience and expertise, in bid protests, noting that the GAO "has established a corps of officials concerned with compliance by procurement officials with provisions of applicable statutes and regulations" and that "there is a not insignificant record of 'corrective action' required by the GAO . . . ." *Wheelabrator, supra,* 147 U.S.App.D.C. at 246, 455 F.2d at 1314.[22]

The D.C. Circuit's most recent pronouncement in this area came in *Kentron Hawaii, Limited v. Warner,* 156 U.S.App.D.C. 274, 480 F.2d 1166 (1973). The court there held that those challenging the legality of procurement decisions

bear a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

22. Of course, GAO decisions are not necessarily dispositive, and there may be instances in which a district court will find procurement illegality that the GAO has failed to recognize or to correct. But as we have noted in following *M. Steinthal, supra,*

the federal courts must pay particular respect to what might be fairly called the "common law of government procurement" —the body of rulings determinations emanating from executive officials and the uniquely situated appeals determinations of the Comptroller General and quasi-judicial boards such

as the boards of contract appeals in many of the various procurement agencies. Thus the deference normally owed an agency's interpretation of its own authorizing statutes and regulations may in some cases induce a federal court in its sound equity discretion to withhold issuance of the preliminary injunction if the agency can demonstrate the likelihood that its procurement decisions followed accepted agency practice.

*Hayes International, supra,* 509 F.2d at 258 n.17.

156 U.S.App.D.C. at 277, 480 F.2d at 1169 (notes omitted).

■ We agree. Courts reviewing government procurement decisions should respect the wide discretion accorded to contracting officers in their evaluation of bids and in their application of procurement regulations. When actions of procurement officials have been expressly validated by considered decisions of the GAO or are in compliance with a reasonably consistent pattern of GAO determinations, the courts should be extremely reluctant to overturn such actions. This is the standard we apply today.

### V.

■ With these considerations in mind, we now examine the proper interpretation of ASPR 1–706.5(a)(1).[23] Regulatory interpretation must, of course, begin with the language of the regulation at issue. We concede at the outset that Kinnett's reading of the regulation is not intrinsically implau-

sible.[24] But that is not the question. In view of the statutory and regulatory setting of ASPR 1–706.5(a)(1), the practical consequences of Kinnett's proposed interpretation, the deference due to administrative interpretation of the regulation, and the language of the regulation itself, we conclude that the government's interpretation of the regulation is a reasonable one which should not be disturbed by this court.

### A.

The government's interpretation of the procurement regulation is fully consistent with the statutory requirements of the Small Business Act and the Armed Services Procurement Act.[25] These controlling statutes simply require that a "fair proportion" of government purchases and contracts be placed with small businesses. Congress left it to the agencies to implement this policy through regulations and practices of their own construction.

---

**23.** A hypothetical illustration may clarify the issue at stake. Assume the existence of a fruit, easy and inexpensive to grow in the proper climate, but expensive to ship long distances. The fruit is grown and marketed in California by a single large enterprise; it is grown in Florida and marketed over a wide area by a multiplicity of responsible small business concerns. The small Florida concerns supply a large percentage of government procurement needs in the eastern portion of the country; indeed, many solicitations are *set aside* for their exclusive participation. However, in California, the transportation costs make the fruit grown in Florida very expensive relative to the native California fruit marketed by the single large supplier. Under Kinnett's theory, as we understand it, a government contracting officer securing a procurement for military bases in California would be required to set aside the procurement for exclusive participation of the small Florida growers, who are both responsible and numerous, and to exclude from participation the large California concern. The contracting officer, under the regulation as so interpreted, would be forbidden to consider the likelihood that reasonable prices could not be anticipated from the Florida growers.

Even where procurement of a particular item, *e. g.,* a major weapons system, from a small business would be economically ludicrous, although theoretically possible, under Kinnett's theory the government might be bound to set aside procurement for exclusive

small business participation if bids on the weapons system, however unreasonable in price, could be anticipated from two or more responsible small businesses.

As this note is intended solely for illustrative purposes, we eschew biting off a metaphor descriptive of the bitter fruit of this interpretive tree.

**24.** We note that Kinnett also concedes that it has "never suggested that the regulation in question is a model of clarity." Appellee's Reply Brief at 8.

It is a well established rule of construction "that 'significance and effect shall, if possible, be accorded to every word'." *Ex parte Public National Bank,* 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202 (1928). The government's interpretation accords full independent effect to the regulation's "so that" clause; Kinnett's interpretation accords no such independent effect.

Nor, contrary to Kinnett's argument, does the government's interpretation strip the first regulatory clause of meaning. Even where the contracting officer has reason to expect that a given small business will submit a bid at a reasonable price, the regulation is not intended to insulate that bidder from all competition where there is no likelihood of competitive bids from a sufficient number of other small businesses.

**25.** *See* notes 16, 17, *supra.*

Kinnett makes the more narrow claim that the defendants have acted in a manner contrary to their own implementing regulations. Needless to say, there is a strong public interest in ensuring that agencies obey their own regulations. But the threat to the public interest becomes much less where there is no substantial claim that the alleged disobedience disserves the dictates of the statutes which the regulations were designed to implement. Moreover, where there is no substantial claim, and no evidence, that a particular administrative practice implementing a congressional policy fails in any way to serve that policy, courts should show great deference to an agency's own determination that the challenged practice conforms with "the intricacies inherent in a comprehensive regulatory scheme," *Allen M. Campbell, supra,* 446 F.2d at 265.

We have little doubt that under current statutes an agency would be authorized to issue regulations unambiguously *requiring* contracting officers to consider price in deciding whether to set aside bids for exclusive small business participation, as long as the resulting contracts gave small enterprises a "fair proportion" of government business. In the instant case we read the key regulation as *permitting* officers to exercise their discretion in such a manner. It would be anomalous for a court to bar an agency applying an ambiguous regulation from permitting certain practices when the court would readily allow the agency to *require* the same practices. This is especially true where, as here, Congress has itself chosen to preserve a high degree of discretion in the agency by enacting only a very broad policy guideline and leaving its elaboration and application to the conscientious expertise of the agency.[26]

Not only is the government's interpretation of ASPR 1.706–5(a)(1) within the permissible scope of the Department of Defense's discretion in drafting the regulation, it is fully consistent with the policies the regulation was designed to effectuate. The statutory command implemented by the regulation is that a "fair proportion" of government procurements be placed with small business enterprises. While mere satisfaction of this objective would neither require nor justify an interpretation of an implementing regulation at war with the explicit terms of that regulation, we think it worth noting that the government's interpretation of the procurement regulation has resulted in quite substantial small business participation in supplying government requirements for milk and dairy products. The record reveals that between May 1977 and October 1977, the dairy, poultry, and bakery branch with which the contracting officer, Mr. Farrow, is associated awarded some seventy percent of $125 million in contract awards to small businesses. Forty-four percent of those awards, totalling more than $38 million, were the result of set-aside actions. There is no suggestion in the record that this is less than a "fair proportion"; indeed, there is testimony in the record that this "is the absolute best of any of the approximately twelve branches in the Defense Personnel Supply Center." Whatever else the merits of the government's interpretation of the procurement regulation and its techniques for implementing that regulation, these facts would seem to suggest the adequacy of the current approach in satisfying the statutory mandate.

### B.

Moreover, the regulation at issue here is merely a single strand in the broad fabric of military procurement policy. The pattern on that fabric is unmistakable—it demonstrates a pervasive and powerful concern for buying supplies at reasonable and competitive prices. It makes little sense to this court to snip out of that fabric a single strand, and simply because it is ambiguously written, to read it as requiring an ex-

---

**26.** We note that the Senate Committee Report accompanying the Armed Services Procurement Act of 1947 stressed, as a primary justification for the Act, the need not merely to permit but to encourage the exercise of judgment and discretion by the contracting officer. Sen.Rep.No. 571, July 16, 1947, reprinted in [1948] U.S.Code Cong.Serv. 1048, 1049–50.

treme and unique obsession with small business for the sake of small business, and damn the pricetag on the torpedoes.

For example, ASPR 3–801.1 states

It is the policy of the Department of Defense to procure supplies and services from responsible sources at fair and reasonable prices calculated to result in the lowest overall cost to the Government.

ASPR 1–300.1 provides that

All procurements, whether by formal advertising or by negotiation, shall be made on a competitive basis to the maximum practicable extent.

See also ASPR 1–304.1, ASPR 2–102.1(a), ASPR 3–807.1.[27]

While we recognize, of course, that the Small Business Act and related legislation and regulations favoring small business modify these more general requirements that the DLA procure goods at "competitive market prices," *see Ray Baillie Trash Hauling, Inc. v. Kleppe, supra,* 477 F.2d at 708, these more general regulations make it clear that price is a central consideration in military procurement. When coupled with the explicit mention of "reasonable prices" in ASPR 1–706.5(a)(1), this fact certainly suggests that the government's reading of that regulation as *permitting* consideration of price is not unreasonable.

Examination of another regulation promulgated by the Department of Defense further supports the government's interpretation of ASPR 1–706.5(a)(1). In a provision expressly governing small business set-asides, ASPR 1–706.3(a), authority is provided for a set-aside determination to be withdrawn prior to award of a contract if "the contracting officer considers that procurement of the set-aside from a small business concern would be detrimental to the public interest (*e. g., because of unreasonable price*) . . . ." (Emphasis added).[28] Thus solicitations set-aside for exclusive small business participation may be cancelled because of price considerations. This again strongly implies that price is a legitimate factor that may be considered by the contracting officer during his initial consideration of whether to set aside the solicitation, a conclusion further reinforced by the explicit terms of ASPR 1–706.3(a):

*Prior to issuing solicitations* each individual procurement governed by a class set-aside shall be carefully reviewed to ensure that any changes in the magnitude of anticipated requirements, specifications, delivery requirements, or *competitive market conditions,* since the initial approval of the class set-aside are not of such material nature as to result in the *probable payment of an unreasonable price* by the Government . . . . (Emphasis added).

If Kinnett's interpretation of ASPR 1–706.5(a)(1) were accepted, and it were clear that no reasonable bids would be received if bidding were limited to small business bidders, the officer would be required to go

**27.** In suggesting that a contracting officer considering a set-aside determination may draw guidance from policies implicit in various provisions of the ASPR, we explicitly do not pass on whether regulations expressly applicable to one procurement context, *e. g.,* procurement by negotiation, have mandatory force or effect in other procurement contexts, *e. g.,* procurement by formal advertisement. We recognize that the GAO decision denying Kinnett's protest may be read to suggest that regulations discussing the adequacy of price competition in the negotiated procurement context are applicable to set-aside determinations. All that is necessary for our decision, however, is the determination that consideration of the policies underlying those regulations is not arbitrary, capricious, and lacking in rational basis in the setting of this case, and we so hold.

**28.** The more general provision governing cancellation of invitations for bids after opening provides that

The preservation of the integrity of the competitive bid system dictates that after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation.

ASPR 2–404.1(a). The regulation then lists the specific reasons for allowing the contracting officer to cancel bids after opening when such action is consistent with the provision quoted above. This listing provides for cancellation when "all otherwise acceptable bids received are at unreasonable prices." ASPR 2–404.-1(b)(vi).

through the charade of setting aside the solicitation, accepting small business bids, cancelling the solicitation after opening the bids, and then starting again from scratch. Each procurement period the farce would be reenacted, *ad infinitum*. This repetitive and disruptive process would entail a substantial cost to the government in terms of wasted time and resources.[29] It is far more sensible to defer to the government's interpretation of ASPR 1–706.5(a)(1), which is more consistent with the regulatory framework of the procurement process in general and with the small business set-aside structure in particular. Certainly the language of the regulation, which refers to "reasonable prices," is subject to such an interpretation.

### C.

We are also required to accord appropriate deference to the views of the GAO. See Section IV, *supra*. In Kinnett's protest to the GAO regarding Solicitation 8570, the Comptroller General had full opportunity to consider Kinnett's argument that ASPR 1–706.5(a)(1) "does not demand that competitive prices be tendered, but merely that competitive small businesses take part in the bidding." The Comptroller General concluded, following a review of the provisions of other procurement regulations and prior decisions by the GAO, that "prices must be arrived at through 'adequate' or 'sufficient' competition." The Comptroller General thus accepted the argument proffered by the contracting officer that "price competition does not of itself ensure that award will be made at a reasonable price, but rather that the adequacy of such competition is the key factor . . . ." The Comptroller General's determination in *Kinnett* appears to be in conformity with a line of GAO decisions recognizing the "adequate competition" concept in the context of small business set-asides.[30]

### D.

We believe it is clear, for reasons already stated, that acceptance of Kinnett's argument that price expectations have no independent role to play in set-aside determinations would lead to consequences inconsistent with the efficient operation of military procurement activities.

We recognize that the policies of the Small Business Act are to some extent inconsistent with what might be perceived as the primary function of the DLA, to supply the procurement needs of the armed forces at minimum cost.[31] The government's interpretation of ASPR 1–706.5(a)(1), carried to an extreme, could be employed by overzea-

---

**29.** The government's reading of ASPR 1–706.5(a)(1) creates a *much more sensible structure* for set-aside bidding. The contracting officer is allowed, but not required, to consider price at the initial stage of determining whether to set aside the solicitation. Where it is probable that set-aside bidding will not result in any acceptable bids, the contracting officer may invite bids on an unrestricted basis under ASPR 1–706.5(a)(1). Where, on the other hand, the contracting officer expects to receive a sufficient number of competitive bids from small businesses so that he is reasonably certain to receive an acceptable bid at a reasonable price, he can set aside the solicitation knowing that if an acceptable bid is not received, ASPR 1–706.3(a) provides a backstop permitting cancellation of the solicitation. (Of course, the policy explicitly favoring award of contracts once bids are opened, see ASPR 2–404.1(a), and the disruption caused by cancellation and resolicitation, may weigh against frequent recourse to this procedure unless the contracting officer is reasonably certain an ac-

ceptable bid will be received.) Thus, the two regulations interpreted and applied in conjunction provide a flexible procurement mechanism adaptable to the requirements of diverse industries and procurement needs.

**30.** *Certain of these GAO decisions are discussed infra* at n.37.

**31.** It is worth noting that the draftsmen of the Armed Services Procurement Regulations were aware that *the incentive structures of procurement officers might evoke greater responsiveness to price considerations than to the needs of small businesses*. Consequently, the procurement regulations provide for input into set-aside decisions by small business representatives, employed by the Small Business Administration. It is a matter not without interest in this context that the small business representative *concurred in contracting officer Farrow's determination to solicit bids on Groups II, III, and IV of Solicitation 0048 on an unrestricted, non-set-aside basis.*

lous procurement officers to undermine this nation's policies favoring small business. This possibility, however, does not mandate acceptance of Kinnett's position in this case.

First, the statute implemented by the procurement regulation itself mandates that a "fair proportion" of government contracts be placed with small business. Here seventy percent in value of government contracts in the milk, dairy, and poultry branch are placed with small businesses under a regime incorporating consideration of adequacy of competition and likelihood of reasonable prices in set-aside determinations. The record contains no hint that this is less than a fair proportion. We have no reason to suspect that contracting officers will not continue to implement the policies of the Small Business Act in making their procurement decisions, and we have little doubt that the courts would look askance at application of a regulation inconsistent with the statutory mandate.

Second, we believe the availability of review by the GAO in bid protests will exercise a check on abuse of discretion by overzealous procurement officers. Our review of GAO decisions in the small business set-aside area makes clear that the GAO accepts the established principle that the government may pay a reasonable premium price to small businesses to implement congressional policy.

Finally, we note that should these checks prove ineffective, action by the Department of Defense or the Congress to further delineate the bounds of discretion in small business set-asides would not be unwelcome. Indeed, if Congress chooses to insulate small businesses from all the rigors of competition from large enterprises in the government procurement setting, whatever the cost to the taxpayers, the path is open. But that is not the task of this court.

### E.

In sum, we conclude that the government's interpretation of ASPR 1–706.5(a)(1) must be accepted. We reiterate the critical clause: a procurement "shall be set aside for exclusive small business participation . . . if the contracting officer determines that there is reasonable expectation that offers will be obtained from a sufficient number of responsible small business concerns so that awards will be made at reasonable prices." While we do not contend that Kinnett's interpretation is intrinsically implausible or at plain variance with the terms of the regulation, neither do we believe that Kinnett's reading is required by the regulatory language. The interpretation urged by appellants, that the contracting officer may consider *both* whether he is likely to receive bids from a sufficient number of responsible bidders *and* whether there is a reasonable expectation that the bids received will result in a competitive and reasonable price, is also consistent with the regulatory language and is, in our view, a far more practical and realistic construction. It is also the construction adopted by the contracting officer and his agency and validated by the GAO, to whom deference is due. Accordingly, we conclude that ASPR 1–706.5(a)(1) permits the contracting officer to exercise discretion on the basis of factors in addition to the number of responsible small businesses expected to bid. We turn now to our second inquiry, whether the contracting officer's exercise of discretion in this case was arbitrary, capricious, and without rational foundation.

### VI.

Our second inquiry concerns the propriety of the contracting officer's consideration of several factors, particularly the "price spread" concept,[32] in his determination that

32. The "price-spread concept," despite its centrality to this litigation, has not been defined with particular precision in the course of these proceedings. Apparently the technique focuses on prior solicitation periods and compares the low bid received with other bids received during the same solicitation to determine the intensity of price competition. When applied to prior set-aside solicitations, the technique compares bids among the competing small businesses. When applied to prior unrestricted solicitations, the technique compares bids among all the competitors, large and small, to determine the price spread between the low small business bidder and the low (or next low) bidder overall. In either case, a price spread with-

a set-aside was unlikely to result in competitive and reasonable prices. Even though we have concluded that the contracting officer may consider price in a set-aside determination under ASPR 1–706.5(a)(1), it may still be the case, as contended by Kinnett, that the price spread concept "is a completely arbitrary, artificial and unreasonable basis" for this determination, that it does not prove or disprove anything, and that it "has no rational relationship to any question."

Once again we stress at the outset the deferential nature of our review. As the D.C. Circuit observed in the *Scanwell* case, *supra*, "it is incontestable that many areas of government contracting are properly left to administrative discretion . . . ." 137 U.S.App.D.C. at 386, 424 F.2d at 874. While contracting officers may not opt to act illegally, they are entitled to exercise discretion upon a broad range of issues confronting them, including "considerations of price, judgment, skill, ability, capacity, and integrity" in the selection of business with whom the government will enter into contracts. *See id.* at 381 n.10, 386, 424 F.2d at 869 n.10, 874.

The question before us is not whether the contracting officer's decision to solicit bids on an unrestricted basis was right or wrong. Rather, we must determine whether that decision was the result of a considered process, rather than an arbitrary and capricious choice based on factors lacking any intrinsic rational basis or relationship to the questions at issue. The burden—and we reiterate that it is a heavy burden—is on the plaintiff to show that "the procurement official's decisions on matters committed primarily to his own discretion had no rational basis." *Kentron Hawaii, supra,* 156 U.S.App.D.C. at 277, 480 F.2d at 1169. The burden on plaintiff in this case is still further increased because the GAO has validated the contracting officer's decision and decision process in a closely related situation.

### A.

Review of the contracting officer's decisionmaking process requires some further articulation of the facts. Unfortunately, the district court's findings of fact relevant to the contracting officer's considerations are fragmentary and may be internally inconsistent. The finding that the basis for defendant's determination to solicit Groups II, III, and IV on an unrestricted basis was that the small business bidders were not responsible (Finding 19) is, as we have already noted, see note 19 *supra,* completely unsupported by the record [33] and is clearly erroneous.

in a given percentage margin (six percent in the milk industry) is taken as a rough indicator of effective competition among bidders on the given solicitation and is considered as one factor in determining the likelihood of effective competition on future solicitations.

An example of the application of the price spread concept was provided in testimony by the government contracting officer, J. C. Farrow:

[I]f the low bidder bid a hundred thousand dollars, regardless of size, well, let's say he is large, and the next bidder bid two hundred thousand dollars and the third bidder bid two hundred and five thousand dollars, the second and third are within two and a half percent of each other. However, they were one hundred percent higher than the low bidder. The government cannot allow a situation like this to exist in the fact that it would not be getting the lowest price possible which is one of the criteria under the bidding system of the government.

Farrow then demonstrated a further opportunity for abuse if in the above example the first bidder was a small business and the third bidder was a small business. In the event the solicitation were 100% set aside, the first bidder would be able to inflate his bid 80–90%. In such a situation there clearly would not be any competition, and the government would be paying an unreasonable premium just so a small business could service the contract.

**33.** The state of the record in this case is, to put it mildly, unsettled. At the hearing on the preliminary injunction held on November 28, 1977, testimony was presented by J. C. Farrow, the government contracting officer, and by Richard C. Slee, Comptroller of Flav-O-Rich's Columbus Division. In attacking many of the district court's findings of fact as unsupported by evidence in the record, appellants focus on the testimony and exhibits presented at the November 28 hearing. In responding to these attacks, Kinnett frequently refers to depositions and other materials related to the earlier

The district court also found that the contracting officer considered the price

litigation between the government and Kinnett, the *Greenberg* case.

During the course of Kinnett's opening statement at the November 28 hearing, counsel requested the court "to take judicial notice of the record in that case [ *Greenberg* ] and asked the clerk to bring it into the courtroom particularly the discovery depositions which were extensive and thorough and the pleadings." Neither Flav-O-Rich nor the government objected to this request. The district court, while apparently not ruling on the motion in open court, stated in its written Judgment that it had taken such judicial notice. The parties in their briefs before this court continue to snipe at one another in vigorous footnote warfare both with respect to the propriety of such judicial notice in the first instance and with respect to what was encompassed in the scope of the district court's judicial notice.

Rule 201 of the Federal Rules of Evidence, providing for the judicial notice of adjudicative facts, states that a court "shall take judicial notice if requested by a party and supplied with the necessary information." Rule 201(d). Here counsel for Kinnett requested the court to take judicial notice of material in its own files and asked the clerk to bring the record of prior proceedings into the courtroom. As Judge Weinstein has noted, "Courts are particularly apt to take notice of material in court files." (1 Weinstein & Berger, Weinstein's Evidence 48 (Supp.1977).)

We have held that it is not error "for a court to take judicial notice of related proceedings and records in cases before that court." *State of Florida Board of Trustees of the Internal Improvement Trust Fund v. Charley Toppino and Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975). *See also Aloe Creme Laboratories v. Francine Co.*, 425 F.2d 1295 (5th Cir. 1970) (per curiam) ("The District Court clearly had the right to take notice of its own files and records and it had no duty to grind the same corn a second time." *Id.* at 1296). Here the district court was faced with issues similar and in some respects identical to those considered in prior proceedings. While Flav-O-Rich was not a party to those proceedings, it makes no claim that consideration of evidence presented in those proceedings is violative of its due process rights. Flav-O-Rich had the opportunity at the November 28 hearing to submit its own evidence and to interrogate those parties whose depositions were part of the record of the prior proceedings. Further, Flav-O-Rich did not object to Kinnett's request for judicial notice. In these circumstances, we find no error in the district court's judicial notice of materials in the court's own files from prior proceedings.

Accordingly, we consider as properly before us all materials entered in the record of the *Greenberg* case, Civil Action No. 76–121–COL.

spread between bids in prior solicitation periods (Finding 20) [34] and Kinnett's loca-

We note that the record of that case does not include a transcript of the proceedings before the district court, which places definite limits on our ability to comprehend fully all that transpired on those occasions. Such material not being in the record, it cannot, of course, provide record support for findings in the instant case.

34. Kinnett argues that Finding 20 states that the unrestricted classification was based *solely* on the price spread and on no other factor. We disagree. The plain terms of the district court's finding ("The aforesaid determination of Defendants . . . was based on their belief that in prior bid periods no small business bidders were within Defendants' acceptable price spread . . ..") do not compel such a reading, which would be inconsistent with the thrust of Finding 21, a finding fully supported by the record, that defendants also considered Kinnett's proximity to Fort Benning as a factor in their set-aside determination. When the district judge desired to indicate sole causation, he was perfectly capable of doing so. Referring in Finding 4 to contracting officer Farrow's action on a prior solicitation, the court stated, "The aforesaid determination of Contracting Officer Farrow *was based solely* on his conclusion . . . ."

Furthermore, if we attribute the meaning desired by Kinnett to Finding 20, the finding would have to be considered contrary to the great weight of record evidence and clearly erroneous.

We have carefully examined all the record references, including the exhibits, listed by Kinnett as supporting its reading of Finding 20. While these references clearly support a finding that price spread was *among* the factors considered—a point conceded by defendants— they do not provide adequate support for a finding that price spread was the only factor considered in Solicitation 0048. Indeed, the only record evidence providing even arguable support for Kinnett's position is the affidavit of James Savage, Marketing Director of Kinnett Dairies, dated November 23, 1976, almost a full year prior to issuance of Solicitation 0048.

In that affidavit, Mr. Savage related, *inter alia*, the content of his telephone conversation concerning Solicitation 8570 with Frank Greenberg, Branch Chief of the Defense Personnel Supply Center and supervisor of contracting officer Farrow. According to Mr. Savage, in that conversation Greenberg stressed the role of the six percent price spread in connection with the decision to solicit bids on an unrestricted basis in Solicitation 8570.

Whatever relevance the Savage affidavit might have had to earlier proceedings concerning Solicitation 8570, we do not believe it can

tional advantage over other small businesses (Finding 21) in making his set-aside determination on Solicitation 0048.

The government acknowledges that Farrow took the price spread and geographical proximity factors into consideration with respect to Solicitation 0048. The government also lists four other factors taken into account as part of Farrow's set-aside determination. While the district court made no findings specifically related to these factors, there is clear and uncontroverted record support that they were considered. We therefore conclude, as a factual matter, that the contracting officer considered each of the following six factors in making his determination:

1) the price-spread concept;

2) the fact that on the preceding procurement for Fort Benning none of the bids received from small businesses was in a competitive range with Kinnett;

3) the fact that on April 1, 1977, government price supports for dairy products had been raised by 9%;

4) knowledge of the fact that although another small business (Dempsey Brothers, Inc.) had successfully bid on Group I in Solicitation 8570 in November 1976, Kinnett had performed that contract pursuant to a subcontract with Dempsey Bros.;

5) knowledge that there had been no award or bid accepted for Group II for a one year period; and

6) the GAO report, B–187501, issued March 24, 1977, which upheld the decision

of the contracting officer not to set-aside the solicitation for Groups II–IV on Solicitation 8570.

In order to evaluate the contracting officer's use of these factors, we must examine in somewhat more detail his articulated decisional process.[35]

The record indicates that J. C. Farrow is a contracting officer with the Defense Personnel Support Center in . Philadelphia, whose duties have included responsibility for milk, ice cream, and dairy products contracts at Fort Benning since December 1, 1976. Mr. Farrow reported that prior to his consideration of the solicitations for Fort Benning he had conducted extensive discussions with industry representatives and with others familiar with the dairy industry. He learned, among other things, that as a result of government regulations, milk processors buy their raw milk at nearly identical prices in any given geographical area. The elements added to this price to arrive at a bid are the vendor's transportation costs and his profit margin after expenses. On the basis of these factors and his own experience, Farrow determined that for a competitive situation to exist in a given geographical area, vendors' offers should be within approximately six percent of one another.

With this in mind, Farrow evaluated the past procurement history for dairy products at Fort Benning dating back to 1974 or earlier. All solicitations during this period had been set aside for exclusive small busi-

serve as an adequate basis for findings relating to Solicitation 0048. There is simply no testimony linking the statements allegedly made by Branch Chief Greenberg in connection with the earlier solicitation to the decision process involved in Solicitation 0048. There is extensive testimony and corroborating exhibit evidence indicating that the price spread was only one among several factors considered by the government defendants in their decision to solicit Groups II–IV of Solicitation 0048 on an unrestricted basis. This record simply cannot support a finding that the price spread was the sole factor considered in Solicitation 0048.

**35.** The following account is culled from several record sources, including contracting officer Farrow's testimony and deposition, exhibits en-

tered in evidence, and a "Report and Recommendation of the Contracting Officer" prepared by Farrow in connection with Kinnett's protest to the GAO in Solicitation 8570. This Report, while not admitted into evidence as such by the court during the November 28, 1977, proceedings, is a part of the record of the Greenberg case and was made part of the record of this case pursuant to the district court's judicial notice of the prior proceedings.

Unlike the situation involving the Savage affidavit, see note 34 supra, there is specific uncontradicted testimony in the record to establish that the factors considered by Farrow with respect to Solicitation 8570 were also considered with respect to Solicitation 0048, as were several additional factors.

ness participation. With respect to troop issue and resale ice cream, Farrow found wide disparities between the offers of competing small business bidders, ranging up to 65 percent.

With respect to resale milk, the disparities were narrower, although on two occasions the price spread between the low and second bidder were on the order of 14 to 15 percent. Disparities between the low and second bidder on troop issue milk were in all instances less than ten percent and on several occasions were less than 6½ percent.

Apparently surprised by the wide disparities between bid prices, Farrow initiated further investigation of procurement practices at Fort Benning. Focusing on the role of transportation expenses in determining bids, Farrow discovered that Kinnett, located some eleven miles from Fort Benning, enjoyed a locational advantage ranging from 73 to several hundred miles over other small business bidders. Kinnett won or performed all the contracts during this period.[36] Farrow concluded from this information that due to its proximity to Fort Benning, Kinnett had a virtual lock on procurement, i. e., that given the absence of meaningful competition, Kinnett in actuality had become a single source.

This conclusion led Farrow to reconsider the set-aside policy theretofore applied to dairy procurements for Fort Benning. Farrow explained that he found himself unable to provide adequate support for findings of the reasonableness of Kinnett's prices on a continuing basis. While noting that Kinnett's prices to the government were lower than prices paid by commercial concerns in the area, Farrow did not find the prices consonant with the government's position as a preferred customer in the milk industry and believed that the government could receive substantially better prices from large businesses, which had not been permitted to offer bids for several years.

Farrow recognized that the government expects to and does pay premium prices to small business as part of its support for the

small business program. But he did not believe those premiums to be unlimited. He considered it his duty to investigate whether the government could receive substantially lower prices by permitting bidding on an unrestricted basis, thus avoiding the payment to small business of premiums considered unreasonable or unrealistic. Farrow felt it would be an abuse of discretion for the contracting officer to do otherwise.

Farrow considered the scope of his discretion on set-aside determinations to be defined by ASPR 1–706.5(a)(1) and by the requirement of ASPR 1–300.1 that all procurements shall be made on a competitive basis to the maximum practicable extent. He stated that he understood these regulations, as interpreted in a series of decisions by the Comptroller General, to provide the contracting officer with discretion to assess the existence of a reasonable expectation of receiving adequate prices from small business concerns. He also made reference to GAO decisions cautioning that in those cases where total set-asides had not generated the anticipated competition, future set-aside determinations should be carefully considered.

Farrow concluded from his investigations that the only realistic and competitive bids submitted on several categories of prior procurements at Fort Benning were those offered by Kinnett and that there was no reasonable expectation of adequate competition from small businesses in the future. Without such competition, there could be no reasonable expectation that Kinnett would submit future bids at reasonable prices. He therefore declined to set aside solicitations for Groups II–IV for exclusive small business participation.

With specific respect to Solicitation 0048, Farrow's more general analysis was buttressed by the favorable result of the GAO decision denying Kinnett's protest in Solicitation 8570. Farrow also considered, in his determination not to set aside Groups II–IV of Solicitation 0048, the impact of a recent

---

**36.** The contract for Group I of Solicitation 8570 was awarded to Dempsey Brothers but performed by Kinnett pursuant to a subcontract.

nine percent increase in government price supports on milk and the fact, due to the district court's injunctive decree in the *Greenberg* case, that no competitive bids on Group II had been received for a twelve month period limiting the amount of relevant recent information on pricing patterns.

37. Our conclusion in this regard is reinforced by the determination of the GAO that the contracting officer's decision and decision process in Solicitation 8570, involving many of these same considerations, were valid and not arbitrary. The GAO also stated in that decision that use of the price spread concept "would not appear to be improper."

The Comptroller General's decision in the *Kinnett* protest appears to be the only determination expressly validating the price spread concept. However, in numerous other decisions in disputes raising related issues, the GAO has recognized both that prices obtainable from large business concerns may be relevant to consideration of the reasonableness of small business bids and that a concept of "adequate competition" measured by price differentials between large and small businesses can be properly employed in determinations regarding small business set-asides.

*See, e. g., West Point Research,* No. B–169083 (April 28, 1970), 49 Comp.Gen. 740, where the GAO upheld the contracting officer's decision to withdraw the small business set-aside and resolicit on an unrestricted basis, explicitly allowing the officer to consider a "courtesy bid" submitted by a large business. The GAO held that the Armed Service Procurement Regulations and prior GAO decisions "cannot reasonably be construed as expressing the view that the amount of the difference in such bids may not properly be considered as a factor in determining the reasonableness of small business bids." 49 Comp.Gen. at 743. While noting that the provisions of the Small Business Act authorize the award of contracts to small businesses at prices higher than those obtainable by unrestricted competition, the GAO found no valid basis for concluding that the Act "was intended to require the award of contracts to small business concerns at prices considered unreasonable" by the procurement officers. *Id.* at 742–43; *see also* No. B–149889 (November 2, 1962). The GAO held that the regulations "properly permit the withdrawal of a set-aside, based on a valid determination that bid prices received from small business concerns are unreasonable." *Id.* at 743.

*See also Boog-Allen Applied Research,* No. B–179085 (November 5, 1973), 53 Comp.Gen. 307 (recognizing that officers are permitted, though not required, to compare small business bids and large business bids from previous competitions in establishing "the competitive range of acceptability"); *Society Brand, Inc.; Waldman Manufacturing Company, Inc.,* No. B–184400 (October 9, 1975), 55 Comp.Gen. 372 (upholding the refusal to cancel a set-aside solicitation, and supporting a contracting officer's view that five percent was a reasonable premium to pay for a small business contract); and Nos. B–183593, B–184058, B–184065, B–184102, B–184102(2), B–184117 (November 19, 1975), 55 Comp.Gen. 475 (noting and affirming the position of the Defense Supply Agency that when a small business set-aside is involved, the contracting officer still has an affirmative duty to seriously consider the prices at which an award can be made. The mere fact that a small business set-aside is involved does not mean that these firms should be subsidized to a point where they are completely insulated from competition from large business firms to the extent that excessive and unreasonable prices are being paid. *Id.* at 483).

## B.

▮ Seen in all its complexity, the contracting officer's decisionmaking process does not seem to us arbitrary, capricious, or lacking in a rational basis.[37] The contracting officer considered the past procurement history, the realities of bid solicitations in a

We wish to note explicitly that many of the decisions just discussed have arisen from challenges not to the initial set-aside determinations but to decisions by contracting officers to make awards, after bids have been received, or to cancel set-aside solicitations and order resubmittals on an unrestricted basis. Thus, unlike the GAO decision in Kinnett's protest regarding Solicitation 8570, they do not, by and large, provide authority with respect to initial set-aside determinations. However, we see no basis for concluding that factors sufficient to justify the withdrawal of a set-aside and resubmission of a solicitation on an unrestricted basis suddenly lose their relevance when the contracting officer is considering whether to set-aside the next successive procurement. Judging from GAO decision in *Kinnett* itself, neither does the Comptroller General. These prior decisions provide important context for the GAO's decision in *Kinnett* and demonstrate a continued administrative recognition that price differentials evidencing the adequacy of competition may be considered in the small business set-aside context. These and other GAO decisions signal the profound conviction of the GAO that "[p]rice reasonableness is basically a business judgment requiring the exercise of

regulated industry, and Kinnett's fortuitous proximity to Fort Benning.[38] Taking all these considerations into account, the contracting officer concluded that Groups II–IV of the instant procurement must be solicited on an unrestricted basis because there was no reasonable expectation that a reasonable price would result if the bidding were restricted to small businesses.

The burden is on Kinnett to demonstrate that the contracting officer's actions were arbitrary, capricious, and lacking in a rational basis. We find no basis in the record for concluding that Kinnett has carried this burden.

Kinnett failed to present any of its own witnesses at the November 28, 1977, hearing to support the conclusory allegations advanced by its complaint. The sole testimony relevant to the Solicitation 0048 decisionmaking process was that of the contracting officer, J. C. Farrow, called by Kinnett as an adverse witness. Nothing in that testimony demonstrates arbitrary or capricious behavior by the contracting officer.

Kinnett has introduced no expert testimony challenging the factual or the judgmental predicates for Farrow's analysis of proper procurement practices in the dairy industry. While Kinnett disagrees with the contracting officer's assessment of the extent and relevance of government price regulations in the dairy industry, it did not introduce expert testimony to substantiate its argument that Farrow's consideration of federal milk marketing orders, which concededly prescribe minimum prices, was arbitrary or capricious. Nor did Kinnett produce expert testimony examining the ramifications of the price spread concept utilized by the contracting officer or challenging the six percent figure selected as an approximate guideline to competitive conditions in the dairy industry. Kinnett's generalized critique of the possible misuses of the price spread concept[39] is simply not

---

broad discretion" by the contracting officer. *Park Manufacturing Company; Century Tool Company*, Nos. B–185330, B–185331, B–185776 (April 16, 1976); *see also Falcon Rule Company; Akron Rule Corporation*, No. B–187024 (November 16, 1976).

**38.** Kinnett seems to believe that it is being unfairly penalized for its proximity to Fort Benning and argues that the proximity factor should "vanish" from this case because Flav-O-Rich is even closer to Fort Benning than is Kinnett. These arguments misapprehend the relevance of the proximity factor. Kinnett is in no sense disqualified from participating in a particular solicitation by virtue of its location. What is significant is that compared to other small businesses in a set-aside solicitation, Kinnett, because of its locational advantage, is effectively a sole source; the other small businesses simply cannot compete in any meaningful sense. Absent such competition, there is no expectation of reasonable and competitive prices and no basis for justification of the set-aside, and large businesses, wherever located, must be permitted to participate in an unrestricted bidding process. Once the bidding is open on an unrestricted basis, locational advantages play their customary role in the marketplace, as do all other economic factors.

**39.** It appears that depending on the fashion in which it is employed, the price spread concept would reveal different sorts of information of greater or lesser relevance to set-aside determi-

nations. Applied to a prior *unrestricted* solicitation, the price spread could be employed to suggest the degree of competition between large and small business competitors and the size of the premium that might result were a subsequent solicitation set aside for exclusive small business participation. Applied to a prior solicitation which was set aside for small business, the price spread would reveal little or nothing about the size of the premium paid by the government to insure award of a contract to a small business concern, but might be useful in suggesting the degree of competition among small business bidders, another factor of clear relevance to the contracting officer's determination.

We note that a small price spread in this context would not necessarily indicate rigorous competition among small businesses. Where, for example, one small business had a determinative advantage over its small business competitors, that business might seek to obtain super-normal profits by bidding relatively high, knowing that it would still be likely to win the contract in view of the absence of effective competition. This would be contrary to the government's interest in having such a firm bid low, thereby sharing the advantages of its low cost structure with the government. Exclusive reliance on the price spread concept might well be counterproductive in such circumstances. Low cost small business firms, aware of such use of the price spread, might well fear that if they did bid low, reflecting their true economic

persuasive enough, without a detailed examination of that concept's failings in this industry and *in this case,* to carry the heavy burden required for Kinnett to prevail in this action.

The evidence presented establishes that the price spread concept was used here as a starting point for further analysis, not as a mechanical rule of decision. Significantly, the record reveals instances in which contracting officer Farrow did set aside solicitations for exclusive small business participation despite price spreads in excess of six percent, both at Fort Benning and at other installations.[40] Further, the record establishes that utilization of the price spread concept *as a guideline* in set-aside determinations, to be considered together with other factors relevant to past procurement history or to expectations of future bidding, is not inconsistent with the set-aside of particular contracts for small businesses or with the award of seventy percent of government contracts in this industry to small businesses.[41]

Absent factual demonstration that use of the price spread concept is arbitrary and without rational foundation in a particular case, or that use of the concept is inconsistent with the statutory objective of insuring

a "fair proportion" of government procurement for small businesses, we cannot say that its use by the contracting officer is improper.[42]

## VII.

In conclusion, we are satisfied that the government neither incorrectly interpreted its procurement regulations nor failed to abide by them in this case. The contracting officer's discretionary determination to invite bids on Groups II–IV on an unrestricted basis was rationally based. The district court's conclusion that the contracting officer's determination was arbitrary and capricious rests on an incorrect perception of the law and on findings of fact unsupported by the evidence adduced at the hearing or the record as developed. The preliminary injunction entered by the district court and stayed by prior order of this court must be vacated, and Flav-O-Rich exonerated from its obligations under the bond.

We have been called to the stage, following several rehearsals, to attempt to harmonize the soprano of concern for small businesses with the mezzo of reasonable pricing for government procurements. Kinnett

---

costs and sharing the advantage of those costs with the government, the gap between their bid and the next lowest bid would be enlarged, thus increasing the price spread and the risk of opening future solicitations to large business competitors on an unrestricted basis.

This counterproductive result can be avoided only if the price spread concept is applied with some caution, as a starting point for further analysis rather than as a mechanical rule of decision. We wish to emphasize that the weak link in Kinnett's argument lies not in its contention that the price spread may be dysfunctional and arbitrary if improperly applied, but in its failure to demonstrate such improper application by the government defendants *in this case.*

40. Contracting Officer Farrow's application of the price spread and other techniques at Fort McPhearson resulted in a decision to set-aside a solicitation whose predecessors had been unrestricted. Among the large businesses eliminated from participation was Flav-O-Rich. Among the small businesses allowed to participate was Kinnett.

41. The record indicates that the price spread concept is applied in the milk, dairy, and poultry branch at DPSC for procurements for every installation in some 41 states.

42. Both the government and Kinnett urge us to make an express decision validating or invalidating the use of the price spread concept in government procurement decisions. Kinnett argues that this concept does not prove or disprove anything, "has no rational relationship to any question," and "is a completely arbitrary, artificial and unreasonable basis" for a set-aside determination. The government apparently seeks near-blanket judicial approval of the price spread concept for use in set-aside determinations. As the foregoing analysis makes clear, we need not accept either position to decide this case, and, on the record before us, we decline to adhere to the positions taken by either of the litigants. We decide today only that the contracting officer's application of the price spread concept in the context presented by this case was not arbitrary, capricious, and without rational basis. We do not today pass on all potential applications of this concept to diverse bidding situations.

would have us toss the bass larger enterprises into the pit, reserving the stage for an exclusive soprano performance. Indeed, there is reason to believe Kinnett aspires to a solo, with sister soprano companies relegated to a distant chorus.

But our role in this milk opera is a limited one. Congress has composed the libretto, and called on contracting officers to conduct. Congress might have composed a different score, expressly excluding the large companies from the hall, except perhaps as spectators, and throwing the costs of their exclusion on the taxpayer-patrons. Instead Congress authored a more harmonious composition, assuring the sopranos a "fair proportion" of time before the spotlights but not granting to them both their desired solo performance and exclusive access to the box office. The conductor has not chosen to interpret the composition to require what the composer has not provided, and has sought to realize a balanced medley. Even if we might choose to conduct the piece differently—and we think it sounds rather melodious this way—we certainly cannot say that the conductor's interpretation or performance are discordant.

It is time to let the performance resume. The conductor is cloaked with wide authority, and performers should be reluctant to again invoke our intervention. As we listen for the final refrain, we trust we shall not be called for an encore.

> Let be be finale of seem,
> The only emperor is the
> emperor of ice cream.[43]

REVERSED and REMANDED for proceedings in conformity with this opinion.

ALVIN B. RUBIN, Circuit Judge, Concurring:

Concurring in what my brother Goldberg has said, I add only the lament, so frequently voiced and so infrequently heeded, concerning the obscurity of federal regulations. As a result of the failure of government officials to write what they urge they meant, unnecessary burdens were placed on Kinnett and Flav-O-Rich, on the procurement officer, and on the federal judicial system.

"Regulations shall be as simple and clear as possible," the President has instructed all executive agencies. Executive Order 12044, March 23, 1978, 43 Fed.Reg. 12661. "They shall achieve legislative goals effectively and efficiently. They shall not impose unnecessary burdens on the economy, on individuals, on public or private organizations, or on State and local governments." This order was issued after these regulations were promulgated but its admonition applies to the maze of regulations already on the Federal Register.

It should not be an insuperable problem for the Department of Defense and other executive agencies to write regulations that conform to the Presidential mandate. Doing so might even ease their own tasks and reduce their own burdens.