**LOUIS DREYFUS & CIE.**, Appellant,

v.

**PANAMA CANAL COMPANY,** Appellee.

No. 18545.

United States Court of Appeals
Fifth Circuit.

Jan. 18, 1962.

Edwin Longcope, Hill, Betts, Yamaoka, Freehill & Longcope, New York City, DeCastro & Robles, Balboa, Canal Zone, for appellant.

David J. Markun, Gen. Counsel, Theodore P. Daly, Asst. Gen. Counsel, Paul T. Dunn, Atty., Panama Canal Co., Balboa Heights, Canal Zone, for appellee.

Before HUTCHESON, RIVES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This is the third of three appeals, argued the same day, involving an allision in the Panama Canal.[1]

Louis Dreyfus et Cie. a French partnership, filed a libel against the Panama Canal Company for damages sustained when its ship, the Charles L. D., struck the banks of the Canal during a transit under compulsory of a Canal Company pilot.[2] The trial judge found that the pilot exercised his responsibility for the navigation of the Charles L. D. with due care and entered judgment against the libelant. We hold that Dreyfus has failed on appeal to demonstrate that the finding was "clearly erroneous."

## I.

The Charles L. D. is a single-screw motor ship of French registry, 6480 gross tons, 3502 net tons, an overall length of 502 feet and a 59-foot beam. It arrived at the Pacific entrance of the Panama Canal December 27, 1951 to make a northbound transit en route from Vancouver, British Columbia to London carrying a full cargo of wheat. Its actual draft was 24'7" forward and 24'11" aft, somewhat less than its authorized tropical fresh water mean draft of 25 feet. Captain Robert G. Rennie, a pilot with fifteen years service on the Canal behind him, was assigned to conn the vessel during its transit. When Captain Piquet, the master of the Charles L. D., informed him that the anchors would not fall free on release of the brakes but would have to be "walked out" (lowered by unwinding the windlasses), Captain Rennie decided to employ a tug to assist in case the ship should encounter steering difficulties. The tug Trinidad, skippered by Captain Robert L. Jordan, an experienced and properly licensed towboat master, joined the Charles L. D. before it entered the first set of locks. The passage proceeded smoothly. At one point the ship was required to stop temporarily in the Gaillard Cut. Before continuing, Captain Rennie ordered the tug to pay out a 250-foot hawser, in compliance with Panama Canal Company Regulations against tying a tug directly to a ship while passing through the Gaillard Cut, a narrow portion of the canal, six miles long, where the channel's width ranges from 300 to 500 feet. The ship traveled the first five miles through the Cut without incident. Then in making one of the turns it experienced a bit of difficulty in steering. Captain Rennie was forced to speed up the engine to increase the rudder's effectiveness. For a short while the vessel proceeded normally, but unexpectedly it "took a quick dive to port." Captain Rennie testified that when the ship started the sheer it was "dead on the ranges," a statement not contradicted by any other witness. As the sheer to port began, the pilot ordered a hard starboard rudder and called to the towboat master to use full force to attempt to break the sheer. The ship grazed the west bank lightly, however, and rebounded toward the opposite bank. Captain Rennie then ordered a hard port rudder to counter the suction

1. See The Andros Shipping Co., Ltd. v. Panama Canal Company (The Andros Venture), 5 Cir., 1962, 298 F.2d 720, n. 1; Mariblanca Navegacion, S. A. v. The Panama Canal Company (The Mariposa), 5 Cir., 1962, 298 F.2d 729.

2. Federal regulations require vessels passing through the Canal to have a Panama Canal pilot aboard. 35 C.F.R. § 4.22 (1953). "The pilot assigned to a vessel shall have control of the navigation and movement of the vessel." 35 C.F.R. § 4.27 (1953). The Canal Company is liable for injuries to vessels caused by the negligence or fault of its officers or employees acting within the scope of their employment. 2 Canal Zone Code, § 10 (b), as amended 64 Stat. 1039.

created by the ship's movement. Flashing his light on the wheel indicator, he noted that it showed only fifteen degrees left rudder. He ordered the engines stepped up to half ahead in an attempt to break the sheer to starboard, but within less than a minute realized that the ship could not avoid striking the east bank. In an effort to cushion the blow he ordered "emergency full astern" and "let go the anchors". Since no one was on the bow manning the anchors they were not dropped until thirty seconds before the ship rammed into the bank. Just before the first sheer, the helmsman encountered difficulty steering the vessel, which he attributed to the pull exerted on the ship by the tug. The master took the steering wheel briefly, then turned it over to the second mate. Jean-Baptiste Bechec, a sailor on watch in the engine room, stated that the master took the wheel to "test its free movement," from which the trial judge inferred that the master moved the wheel to unknown positions; the appellant sharply contests this finding.

On several points the facts are hotly disputed. The trial judge found that the sheers were caused either by a temporary steering gear failure or by the master's unauthorized movement of the rudder. Dreyfus contends that these findings are sheer speculation unsupported by testimony, and it attributes the accident to the negligence of pilot Rennie in exposing the ship to bank suction and in failing to utilize the tugboat properly. The trial judge also found that during the first sheer to port the pilot issued an order to drop the starboard anchor that was never carried out; the appellant denies that the pilot ever gave such a command. Dreyfus asserts that the trial judge erred in attaching importance to the pilot's testimony that the wheel indicator did not show the "hard left rudder" which he had ordered, since that reflected only the normal sixty-second lag of the instrument in recording the change. The district judge found that the Chief Engineer was absent from the engine room when the order for emergency full astern was given and that his absence caused a lack of supervision over the subordinates who became confused and for a moment put the engines at full ahead. The appellant contends that the Chief Engineer was back in the engine room when the emergency order was given, that the pilot jingled the telegraph so rapidly that his orders could not be understood, and that there was no basis for finding that the engines had been run full ahead after the full astern order.

II.

The appellant's first contention is that Captain Rennie was negligent in exposing the vessel to bank suction. We agree with the Panama Canal Company that under the facts of this case this argument is little more than an attempt to reinstate *res ipsa loquitur* under a slightly altered title. Every ship that passes through the Gaillard Cut will be exposed to bank suction, at least to a limited extent; the phenomenon is ever present in a restricted channel and will affect ships whenever they stray from its center.[3] Safety requires certain precautions against the danger, and a pilot could be negligent in exposing a ship to the forces of bank suction by carelessly allowing it to run close to one bank or the other. But in this case the uncontradicted testimony is that the ship was "dead on the ranges" when the initial sheer began. Rennie was doing just what his job required, and by keeping the ship in the center of the channel he was doing it in the safest way possible.

Dreyfus asserts that Rennie was negligent in placing the tug ahead of the Charles L. D. on a hawser rather than tying it directly to the stem of the ship. It acknowledges that Rennie's action was in conformity with the regulations of the Panama Canal Company, but challenges the soundness of these regulations. There is testimony in the record that

---

3. See the discussion of bank suction in The Andros Shipping Co., Ltd. v. Panama Canal Company and Empresa Del Petroleo, 5 Cir., 1962, 298 F.2d 720.

a tug attached at the bow is more effective in controlling the ship's movement, but that evidence is not conclusive. There is testimony too that in a narrow channel there is danger in tying a tug to the side of a ship, for if the ship moves out of control the tug may be crushed against the banks. The evidence is conflicting and, on the record, we cannot say that Captain Rennie was negligent in adhering to the established practice of Canal pilots.

Dreyfus asserts that Captain Rennie should have taken the Charles L. D. through the Canal as a dumb vessel drawn by two tugs, citing this Court's decision in Panama Canal Company v. Sociedad de Transportes Maritimos, 5 Cir., 1959, 272 F.2d 726. In that case we affirmed the district court's finding that the pilot had been negligent in not employing two tugs to take the Aurora Borealis through the Canal. But the facts of that case were substantially different from those of the case at bar, as is reflected by the Court's statement:

"This is not a case where there was one sudden, uncontrollable, unexpected sheer that forced the vessel into the bank. The whole transit of the Aurora through the Cut consisted of sheering, correcting a sheer, and then sheering the other way. While the tug was being made fast to the Aurora, it veered off course. While being towed, the Aurora veered first to port and then to starboard before the final port veer that caused it to strike the east bank. Long before the accident, this erratic course should have made it clear to a reasonably prudent pilot that he could not control the Aurora with a single tug." 272 F.2d at 730.

By contrast, the instant case is precisely the one that we carefully distinguished: "one sudden, uncontrollable, unexpected sheer that forced the vessel into the bank." It is undisputed that Captain Rennie did not experience any difficulty controlling the ship until just before the accident and that the ship handled about

as well as the average heavily laden ship of its size. There was therefore nothing to warn Rennie of imminent danger or to require him to take special precautions. If the appellant were to prevail here, the Canal Company would be obliged to revamp its whole method of operation. There is no indication in the record that such vast alterations are necessary or desirable. The trial judge correctly ruled, therefore, that Captain Rennie was not negligent in following the customary practice of piloting the Charles L. D. through the Canal under its own power.

The appellant's fourth and final contention to support its allegation that Captain Rennie was negligent is that he failed to establish and maintain adequate communications with the tugboat master, Robert L. Jordan, and to instruct him what to do. The evidence on this point is relatively clear. At the outset Rennie informed Jordan that the reason for employing the tug was to assist in holding the ship on course, since it would not be possible to drop the anchors quickly if an emergency arose. He instructed Jordan to keep a fairly tight hawser and to keep in the center of the Canal. Dreyfus asserts that confusion existed because Jordan interpreted these orders to mean that he was to keep the Charles L. D. in the center whereas they state that Rennie really meant for Jordan to keep the tug in the center. The supposed misunderstanding is entirely lacking in reality. The effect of either interpretation is the same: Jordan was to assist in holding the Charles L. D. in the center of the channel by exerting a forward pull from the center of the channel. Captain Jordan was an experienced towboat operator who had worked in tugs in the Panama Canal steadily since 1929. It was hardly necessary to spell out in black letters to him the function he was to serve. The weakness of the argument is evidenced by the absence of any suggestion by the appellant that Jordan should have handled the tug differently than he did. The contention that the pull exerted by the tug impeded the

efforts to steer by the rudder is unrelated to the alleged misunderstanding between Rennie and Jordan, and it finds scant support in the record.

■ In this case as in the two companion cases involving allisions in the Panama Canal, the libelant urges that the district court decision is not entitled to the full credit usually extended to the findings made by the trier of facts since the trial judge uncritically adopted, virtually verbatim, the proposed findings submitted by counsel for the Panama Canal Company. The respondent submitted seventeen findings of fact. The trial judge incorporated sixteen into his findings verbatim, omitting one incidental finding not related to any disputed question. We disapprove of the practice of a trial judge's uncritically accepting proposed findings, but this unfortunate practice does not erase the "clearly erroneous" rule.

■ We note at the outset that the effect of over-reliance on proposed findings is not affected by the fact that this is a suit in admiralty. The provisions governing the form of decisions by the federal district courts are the same whether the suit is in admiralty or in law or equity. Admiralty Rule 46½, 28 U.S. C.A., provides that the court of first instance "shall find the facts specially and state separately its conclusions of law thereon." This is the exact language used in Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The standard governing appellate review is also the same: it may set aside findings of fact only if "clearly erroneous". While in certain respects admiralty jurisdiction is unique and has special rules, for purposes of determining the proper procedures to be followed in framing decisions admiralty does not possess unusual characteristics that set it apart from the wide range of cases handled under the Rules of Civil Procedure. In the absence of any reason justifying different treatment, it is of course highly desirable to promote a uniformity of procedure. This is not only a matter of great convenience to lawyers and judges; it also advances the ends of justice by limiting the possibility that the result of a trial or appeal may depend on the mere happenchance of the forum in which the suit is brought. We look therefore not only to the cases applying Admiralty Rule 46½ but also to those under Rule 52(a), Fed.Rules Civ.Proc. There is, however, no significant difference between the approaches developed by cases under the two rules.

Numerous cases have approved the practice of adoption by the trial judge of findings submitted by counsel for the prevailing party and have held that such findings are entitled to the same weight as they would receive if drafted by the judge himself. Mississippi Valley Barge Line Co. v. Cooper Terminal Co., 7 Cir., 1954, 217 F.2d 321, 323; Vincent v. Suni-Citrus Products Co., 5 Cir., 1954, 215 F.2d 305, 310–311, cert. denied, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744; Saco-Lowell Shops v. Reynolds, 4 Cir., 1944, 141 F.2d 587, 589; Schilling v. Schwitzer-Cummins Co., 1944, 79 U.S. App.D.C. 20, 142 F.2d 82, 83–84; Miller v. Tilley, 8 Cir., 1949, 178 F.2d 526, 528. In several cases courts have nevertheless indicated doubts as to whether the adopted findings can be as fully relied upon. In Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1958, 259 F.2d 398, 401, cert. denied, 361 U.S. 903, 80 S.Ct. 210, 4 L.Ed.2d 158, we stated, "we must say that findings and conclusions which represent the independent judicial labors and study of the district judge are more helpful to this Court." In Mesle v. Kea Steamship Corporation, 3 Cir., 1958, 260 F.2d 747, 750, cert. denied, 359 U.S. 966, 79 S.Ct. 875, 3 L.Ed.2d 834, the Court declared, "We have in mind the edict in McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 that a judgment in admiralty is not to be set aside unless it is clearly erroneous. And yet where the court has not independently set out its findings we think the reviewing court may more readily be ' *    *

"left with a definite and firm conviction that a mistake has been committed." ' " [4]

In analyzing the significance that should be attached to the adoption by the trial judge of findings drafted by one of the litigants, common sense may be a better guide than ideal decision-making. As an ideal matter it would be desirable for the trial judge to draft his own findings in every case. This would supply insurance, for the benefit of the appellate court, that the trial judge did indeed consider all the factual questions thoroughly and would guarantee that each word in the finding is impartially chosen. In the workaday world, however, it may often be necessary for a hard-pressed district court to take assistance from counsel in articulating his decision.[5] This assistance may be especially helpful in a case involving complex and technical subject matter, as in patent cases, where the aid of a specialist may be but a shade short of indispensable. In such cases it must be assumed that the trial judge considered the case from all angles and reached his decision independently *before* placing reliance on the proposed findings. The ultimate question that the judge must face is whether to enter judgment for plaintiff or defendant, and he must decide this question on his own before deciding which proposed findings to accept. Since his mind must range over the same questions to make this decision that it would to write the findings the result will be the same, and his factual determinations should, as in any other case, be set aside only if clearly erroneous.

◼ Although the standard of review is the same, however, there is and should be a certain leeway in applying the standard to varying cases. When the findings have been drafted by the trial judge himself, they carry a certain badge of personal analysis and determination that may dissuade an appellate court from reversing in a doubtful case. When that badge is missing, the appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered—if the evidence supporting the decision is of a doubtful nature. The significance of these considerations with regard to any particular finding depends on the nature of the issue and the relevant evidence. If the decision depends directly upon two or three issues that are clearly drawn, it will be clear that the judge must have focused on those questions before reaching his decision, and therefore it can readily be assumed that the findings accurately reflect his convictions. By contrast, if the questions of fact are complicated and numerous, not all of them being crucial to a determination of the case as a whole, there is greater cause for suspicion that the judge may have allowed certain of the proposed findings to slide under the fence, despite his doubts as to the questions, because they were not necessary to the decision. The

---

4. A strong statement to this effect is found in The Severence, 4 Cir., 1945, 152 F.2d 916, 918, cert. denied 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626: "This practice is not to be commended. It has been condemned by many courts as not living up to the provision of Admiralty Rule 46½ * * * these findings of fact and conclusions of law are not, at our hands, entitled to the same weight and dignity which they would have possessed had they represented the unfettered and independent judgment of the trial judge." See also Tanker Hygrade No. 24 v. The Dynamic, 2 Cir., 1954, 213 F.2d 453, 456: "An appellate court, however, can be more sure that he has done so when his findings and conclusions give unmistakable evidence that he has prepared them as a result of his own independent study and research and will give them weight accordingly." See also Edward Valves, Inc., et al. v. Cameron Works, Inc., 5 Cir., 1961, 289 F.2d 355.

5. In Dearborn Nat. Casualty Co. v. Consumers Petroleum Co., 7 Cir., 1947, 164 F.2d 332, 333 the Court stated, "While the burden and responsibility to make findings of fact and state conclusions of law thereon are primarily upon the trial court, certainly counsel for the parties, especially the prevailing party, have an obligation to a busy court to assist it in the performance of its duty in this regard."

findings also will carry more of a badge of personal determination when the trial judge has selected certain of the proposed findings but written others himself or when he has revised and edited the proposed findings, than they will when he has adopted a slate of findings verbatim. It must be remembered, however, that these are subtle considerations that will affect an appellate court's decision only within a narrow range of doubtful cases. When substantial evidence supports a finding it will not be found clearly erroneous merely because the expression of the finding was adopted from a proposal by counsel.

 The case at bar is in certain respects one where the maximum doubt is cast on the findings of fact by their adoption from the litigant's proposals. The court based its decision almost entirely on the proposed findings. The issues are complex, and the adopted findings cover twelve pages in the record and deal with a great variety of questions. Many of these questions are sharply disputed and certain of the findings lack a strong basis on the evidence. In particular we are in doubt whether the evidence supports the finding that the engines were put at full speed ahead after the order for emergency full astern was given. In these circumstances, we have felt it necessary to read all of the record carefully. There is a fatal defect in the appellant's attempt to reverse the decision below on the doubts it raises as to these findings: that defect is their irrelevancy to the decision under attack. That decision rests directly on the single conclusion that Captain Rennie was not negligent, and the appellant's attacks on the findings do not present any basis for impugning that finding. At most appellant challenges the implications in the findings that the accident was attributable to the fault of the vessel and its crew. But Dreyfus cannot rely on *res ipsa loquitur* and must do more than show that it was not at fault. It must show that Captain Rennie was at fault. On that question it has little basis for argument. The evidence on these other matters is certainly not so contrary to the findings as to suggest that the trial judge failed to perform his function conscientiously or entirely misunderstood the case, and his adoption of findings proposed by one of the parties will not create an inference to that effect. It is unnecessary therefore to discuss the evidence pertaining to the collateral questions.

The decision is

Affirmed.