DOROTHY B. EDINBURG *vs.* DAVID F. CAVERS, JR., trustee,
& others[1]
(and a companion case[2]).

Suffolk. February 13, 1986. — May 19, 1986.

Present: GREANEY, C.J., BROWN, & SMITH, JJ.

*Judge. Practice, Civil,* Findings by judge. *Trust,* Removal of trustee.
*Probate Court,* Removal of fiduciary. *Fiduciary. Corporation,* Close
corporation. *Consumer Protection Act,* Availability of remedy.

There was no support in the record for a party's contention that the judge who
heard a protracted and acrimonious civil proceeding should have recused
himself because he exhibited bias. [217-218]
Where the judge's extensive findings of fact in two related civil actions were
not clearly erroneous, and bore the imprint of his independent judgment,
the findings were entitled to the weight customarily afforded findings
of trial judges, even though they had been taken largely from proposed
findings submitted by counsel. [218-220]
The judge in a civil action did not err in ruling that the plaintiff had not sus-
tained her burden of proving that her husband, one of the defendants,
had agreed to transfer certain shares of the stock of a closely held family
corporation to a trust created by the plaintiff's father. [220]
In proceedings seeking the removal of an attorney from his position as one
of the trustees of a trust established for the purpose of holding a majority
of the voting shares of the stock of a closely held family corporation,
during the course of which the various assertions of the plaintiff, who
was the daughter of the trust's settlor and herself a beneficiary and
cotrustee, amounted, in sum, to a claim that she had been effectively
frozen out of participation in the trust and, indirectly, in the company,
the plaintiff made no showing of fraud or dishonesty by the defendant
trustee, nor of his incapacity or negligence detrimental to the trust prop-
erty, and the judge, on the entire record, had reasonable basis for exer-
cising his discretion not to remove the defendant as trustee. [220-228]

[1] Joseph M. Edinburg, deceased trustee, Jo-Ann Edinburg Pinkowitz,
John D. Edinburg, and Hope Edinburg.

[2] Dorothy B. Edinburg *vs.* Golda Edinburg and Arthur Vershbow,
executors, David F. Cavers, Jr., and Jo-Ann Edinburg Pinkowitz, Hope
Edinburg, and John Edinburg.

The remedies provided by G. L. c. 93A, the Consumer Protection Act, did not cover an individual's private actions as trustee or his conduct as an officer of or legal counsel to a close corporation. [229]

CIVIL ACTIONS commenced in the Superior Court Department on April 16, 1981, and April 16, 1982, respectively.

The cases were consolidated for trial before *Edward M. Ginsburg,* J., sitting under statutory authority.

*Geoffrey D. Wyler* for the plaintiff.

*George S. Abrams* (*Peter J. Sonnabend* with him) for Jo-Ann Edinburg Pinkowitz & others.

*Michael J. Liston* for David F. Cavers, Jr.

GREANEY, C.J. In these appeals by Dorothy B. Edinburg from a judgment in the Superior Court, we are concerned with the control of the Edinburg family business, Chandler & Farquhar Company, Inc. (company).[3] The first case (no. 84-690) was commenced by Dorothy on April 16, 1981, about three months after she had started divorce proceedings against her husband, Joseph M. Edinburg. By her amended complaint, Dorothy sought to remove Joseph (who died on February 16, 1983) and Mr. David F. Cavers, Jr., a lawyer, as trustees of the Dorothy B. Edinburg Trust (DBE trust). This trust, which is irrevocable, had been established to operate the company. Dorothy alleged that Joseph and Mr. Cavers had violated their fiduciary duties and had committed numerous other acts of misconduct in handling the business of both the company and the DBE trust. The amended complaint also sought damages and included a claim under G. L. c. 93A. Dorothy's three children, remainder beneficiaries of the DBE trust, were named as defendants in the action. They counterclaimed, seeking Dorothy's removal as a trustee and cancellation of her power to appoint successor trustees.

The second case (no. 84-691) was commenced on April 16, 1982. By her complaint, Dorothy sought transfer to the DBE

---

[3] The company was established by Dorothy's father in the 1930's. It operates principally as a tool supply house with over $9,000,000 in annual sales in 1980 and 1981.

trust of 800 shares of the company's common stock then held by Joseph. Dorothy asserted that the shares should have been included originally in the assets of the trust because Joseph had agreed to transfer them in 1958 as part of an estate plan created by Dorothy's father to avoid taxes.

The cases were consolidated with the other pending Edinburg actions and were tried for eleven days before the probate judge of the Middlesex Division who was hearing all the Edinburg litigation. On September 9, 1983, the judge made "Findings of Fact and Conclusions of Law" pertaining to both cases and entered judgments against Dorothy. The judge ordered Dorothy removed as a trustee, struck the provisions of the trust granting her the power to appoint successor trustees, retained Mr. Cavers as a trustee, and appointed two attorneys as trustees to fill the vacancies left by Joseph's death and Dorothy's removal. He also concluded that Dorothy had not sustained her burden of proof that the 800 shares of the company's common stock held in Joseph's name actually belonged to the trust. Finally, the judge decided that Dorothy was not entitled to damages.

For background, we summarize facts found by the judge. The DBE trust was created by a deed of trust dated July 2, 1958. Creation of the trust was part of an effort begun in 1957 by Dorothy's late father to respond to an Internal Revenue Service investigation of his business and to transfer ownership of the company without incurring potential gift or estate taxes. To effect his plan, Dorothy's father had the company purchased by Joseph, who received 2,000 shares of the company's outstanding common voting stock. Joseph, as settlor of the trust, then transferred 1,200 of these shares (representing sixty percent of the common stock) into the newly-created DBE trust. Dorothy was the life beneficiary of the trust, and the children of Joseph and Dorothy the remainder beneficiaries. Original trustees were Joseph, Dorothy, and Mr. Henry L. Mason, Jr., an attorney. The trust instrument gave Dorothy the power to appoint successor trustees. Through ownership of the stock, its sole asset, the DBE trust has the controlling interest in the company. Joseph retained ownership of the remaining 800 shares (forty percent) of the company's common stock until

February 5, 1981. On that date, he transferred the 800 shares to himself and Mr. Cavers as trustees under a revocable trust, the terms of which provided for the payment of the trust income to Joseph for his lifetime, and at his death the remainder to his children.

After serving from 1958 until 1972 as a trustee of the DBE trust, and as corporate counsel, director, and clerk of the company, Mr. Mason resigned. On December 30, 1972, Dorothy appointed Mr. Cavers, then a partner in a Boston law firm, as a trustee of the DBE trust to fill the vacancy left by Mr. Mason. Mr. Cavers also became clerk of the corporation and served as its corporate counsel; however, he never became a director of the corporation.

From 1958, when the DBE trust was formed, until the summer of 1980, management of the company and of the trust was uneventful and proceeded without dispute. As president and treasurer, Joseph ran the company through the period from December, 1976, until his death in 1983.

Despite assertions to the contrary, from 1958 to 1980 Dorothy never demonstrated any interest in the affairs of either the company or the trust, regardless of her position as trustee. She never questioned Mr. Mason or his successor, Mr. Cavers, with respect to any company-related matters, nor did she express any complaint about the management of the company or the administration of the trust. Throughout this time, the company was operated, as the judge found, with the "corporate informality" often seen in closely held family corporations. Corporate records showed annual meetings of shareholders. However, during the period, Dorothy neither received notice of a shareholders' meeting nor attended any of those meetings. (Because she was never a director, Dorothy did not attend directors' meetings.) Similarly, no formal meetings of the trustees of the DBE trust were held. As a trustee, Dorothy, in effect, left management of the DBE trust to the other trustees: her husband and either Mr. Mason or Mr. Cavers.

In 1966, the company created and authorized the issuance of 3,800 shares of preferred stock in addition to the 2,000 shares of common voting stock. The Hope Edinburg Trust, of

which Dorothy was settlor and her daughter Hope Edinburg beneficiary, received 442 shares of the preferred stock. The balance (3,358 shares) was held in the testamentary trust established by Dorothy's father, Harry B. Braude. Dorothy and her mother were trustees and life beneficiaries of the Harry B. Braude testamentary trust. The company's articles of organization mandated the payment of a yearly dividend on the preferred stock of at least $7.00 a share. The articles further provided that if this dividend should be in default for a period in excess of one year following the close of the corporation's prior fiscal year, the preferred shareholders would acquire voting rights.

On August 22, 1980, Dorothy for the first time communicated by telephone with Mr. Cavers with respect to the operation of the company. Dorothy complained to him about the company's failure to pay preferred dividends for fiscal year 1979 and about not receiving dividends on the common stock. She made general allegations of misfeasance and corporate waste by Joseph, including a claim that he had forged her name to a document indirectly affecting the DBE trust. She also advised Mr. Cavers that she had engaged counsel to represent her. At that time, she voiced no complaint whatsoever about any action or inaction on the part of Mr. Cavers, either as clerk of the corporation or as trustee of the DBE trust. Earlier in the summer, she had requested that Mr. Cavers act as a trustee of one of the children's trusts.

Other than a second short telephone conversation in September, 1980, after the preferred share dividend for fiscal 1979 had been paid, Mr. Cavers had no direct contact with Dorothy. Nor did she make any complaint about his conduct until the filing of her petition to remove him as a trustee of the DBE trust in April, 1981.

At the time Dorothy made her August 22, 1980, telephone call to Mr. Cavers, she had decided to divorce Joseph and had engaged counsel to prosecute that intention and to examine the administration of the DBE trust. Mr. Cavers did not understand that the situation between the two Edinburgs had become adversary until the August 22nd telephone conversation. Prior to the summer of 1980, there had been no indication of marital

discord between the two, even to persons who worked closely with Joseph.

In December, 1980, Mr. Cavers introduced Joseph to Mr. Lawrence T. Perera, a partner in a different Boston law firm. Thereafter, Mr. Perera represented Joseph in the divorce and in the other proceedings Dorothy had commenced against him.

1. *Recusal.* Dorothy argues that the judge should have recused himself from hearing these cases (and the other cases as well) because he exhibited bias toward her at all stages of the proceedings. Her recusal argument is based upon certain comments made by the judge, as well as upon piecemeal criticism of the judge's findings of fact that are adverse to Dorothy's position in the litigation. In her view, the comments and the findings demonstrate that the judge was prejudiced.

The claim is without substance. The rules governing the recusal of a judge are not intended to provide litigants with a means of obtaining a judge of their choice. See *Blizard* v. *Fielding,* 454 F. Supp. 318, 321 (D. Mass. 1978), affd. sub nom. *Blizard* v. *Frechette,* 601 F.2d 1217 (1st Cir. 1979). Discharge of a judge from a case after hearings have begun is unusual and ought not to be done in the absence of compelling reasons. See *Dittemore* v. *Dickey,* 249 Mass. 95, 99 (1924). Indeed, a judge may very well have an obligation "to resist a challenge to his impartiality which is tenuous, baseless or frivolous." *Police Commr. of Boston* v. *Municipal Court of the West Roxbury Dist.,* 368 Mass. 501, 508 (1975).

The Edinburg proceedings were protracted and engendered an intense amount of hostility among the parties and, at times, their counsel. A review of the voluminous record in the cases reveals that the judge, presiding in an emotionally charged atmosphere, exhibited considerable patience in dealing with the litigants and their counsel and that he gave the parties ample opportunity to present their respective sides of their cases.[4] While there were some sharp exchanges between counsel and the court, we do not view the snippets of dialogue of

---

[4] The judge's indulgence in this regard often allowed the parties to repeat testimony that had been heard earlier in the trial.

this type that have been reproduced on appeal by Dorothy as demonstrating bias. Nor do we consider any of the judge's remarks dwelt on by Dorothy, when read in context and with account taken for obvious stenographic errors,[5] as disclosing a preconceived notion on his part of what the results ought to be. "No doubt the judge in the course of the proceedings below formed a negative impression of [Dorothy] . . . based on his appraisal of [her] performance. But that is not a ground for the assertion of a disqualifying bias." *Perez* v. *Boston Housing Authy.*, 379 Mass. 703, 740 (1980). Finally, the timing of the recusal motion (some eleven months after the judge had started presiding over the many aspects of this complicated litigation) bespeaks a calculated attempt on Dorothy's part to minimize the disastrous effect upon her case of her admissions of perjury and document fraud. See *Edinburg* v. *Edinburg, ante* 199 (1986). We perceive in the judge's rulings on the recusal matter an indication that he could continue to maintain his impartiality as he had in the past. Upon consideration of the whole record, we do not reach any contrary conclusion.

2. *The attack on the expression of the judge's findings.* Also without merit is Dorothy's contention that the judge's adoption of findings of fact submitted by the prevailing parties constituted an abdication of his responsibility to make an independent decision of the cases.

The judge's decision in this case comprises seventy-two pages of written materials, consisting of 195 findings labelled as "Findings of Fact," fourteen separate "Conclusions of Law," and a seven-page "Discussion" section. Most of the findings of fact were taken from the proposed findings submitted to the judge by counsel for the children and for Mr. Cavers. However, the judge accepted proposed findings and rulings from all the parties, not only from the prevailing parties as occurred in *Cormier* v. *Carty*, 381 Mass. 234 (1980).[6] Except for errors in

---

[5] Dorothy's counsel, Mr. Wyler, is to be criticized for selecting material containing stenographic errors and attempting to construct from them an argument that the judge was biased.

[6] Dorothy's counsel boldly misrepresents the holding in *Cormier* v. *Carty, supra,* in which the Supreme Judicial Court affirmed, not reversed, the

a few inconsequential findings, most of the findings, particularly the critical core findings[7] are supported by the underlying evidence. If a judge's findings of fact are adequate under the "clearly erroneous" test articulated by Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), even though taken largely from findings proposed by counsel, then the central purpose called for by the need to prepare findings has been satisfied. See *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 622 n.12 (1985). Moreover, the "Discussion" section of the judge's decision leaves no doubt that the judge adopted the findings proposed by counsel for the children and Mr. Cavers because they accurately expressed his decision after his consideration of the evidence and his evaluation of the credibility of the witnesses.[8] See *Cormier* v. *Carty,* 381 Mass. at 237 n.7. We are satisfied that the judge's findings bear the imprint of his

decision of the trial judge. The Supreme Judicial Court was critical of the judicial practice of using findings and conclusions prepared by prevailing counsel after a decision had been reached. *Cormier* v. *Carty, supra* at 236. Nevertheless, the court noted that the findings adopted by the judge remained her own and, after scrutinizing the *Cormier* findings in light of the evidence, upheld the judge's conclusions.

[7] Many of the 195 findings in the "Facts" section of the decision simply recount the procedural history of the case, present uncontested facts, or summarize the contentions of the parties. It is unreasonable to suggest that these essentially neutral findings, which laid the groundwork for the judge's discussion, should have been reworked by the judge. While the total testimony was substantial, the relevant contested issues of fact could be reduced to seven or eight clear questions. In *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 431 (1980), where, despite the "volumes of evidence," the factual issues essentially turned on a few points, this court observed (quoting from *Louis Dreyfus & Cie.* v. *Panama Canal Co.,* 298 F.2d 733, 738 [5th Cir. 1962]) that, "'[i]f the decision depends directly on two or three issues that are clearly drawn, it will be clear that the judge must have focussed on those questions before reaching his decision, and therefore it can readily be assumed that the findings [although prepared by counsel] accurately reflect his convictions.'"

[8] We reject Dorothy's claims that the "Discussion" section was improper and that its insertion vitiates the entire decision. Whether to include such a component in the decision was entirely within the judge's discretion. Although not the same as his findings of fact, the "Discussion" section discloses the judge's reasoning process. We find it helpful to the resolution of the issues in these appeals.

independent judgment and that they should be given the weight customarily afforded findings of trial judges.

3. *Ownership of the 800 shares of the company's stock.* The judge's ruling that Dorothy had not sustained her burden of proof that the 800 shares of the company's stock belonged to the DBE trust reflects the judge's rejection of her testimony and the questionable documents that she produced for the first time at the trial. We note, as did the judge, that the company's corporate records and related documents (which were properly admitted in evidence) reflected Joseph's ownership of the stock, see *Simon* v. *Weymouth Agricultural & Industrial Soc.,* 389 Mass. 146, 151 (1983), and that prior to the trial Dorothy had made what could be viewed as admissions acknowledging that the stock belonged to Joseph. There was no error in the ruling.

4. *Removal of Mr. Cavers as a trustee of the DBE trust.* The bulk of Dorothy's arguments concern her request that Mr. Cavers be removed as a trustee of the DBE trust for his alleged failures in administering the trust and handling the company's affairs. As has been noted, the company had an unusual structure. Ownership of its common (voting) stock was divided between the DBE trust (sixty percent) and the trust later established by Joseph for the benefit of his children (forty percent). Ownership of the preferred stock, which could acquire voting rights, was held by the trustees of the Hope Edinburg trust (442 shares) and the testamentary trust established under the will of Dorothy's father (3,358 shares). Joseph, as president and treasurer, was the company's chief operating officer;[9] Mr. Cavers was company clerk and legal counsel. The company's board of directors consisted of Joseph, the two vice presidents and a director from outside the company.

Dorothy makes numerous charges of dereliction on Mr. Cavers' part. Her principal claims involve accusations that he (a) failed to hold properly constituted meetings of the trustees and to require the trustees' unanimous approval of trust business; (b) failed to investigate her charge that Joseph had forged her

---

[9] His son John D. Edinburg was a vice president and assistant treasurer. A third individual, Allan Maiden, was also vice president.

name to a document involving the realty trust that owned the company's real estate; (c) displayed partiality to Joseph at the expense of the DBE trust; (d) allowed company assets to be used for Joseph's personal benefit; (e) acted improperly at a September 22, 1980, directors' meeting; (f) excluded her from participation in trust affairs; and (g) deceived her at a meeting on February 4, 1982, about the status of 800 shares of company common stock and the company.

The assertions, taken collectively, amount to a claim by Dorothy that she was effectively frozen out of participation in the trust (and, indirectly, the company) by Mr. Cavers' manipulations and subservience to Joseph's interests. The charges made by Dorothy against Mr. Cavers were analysed one-by-one by the judge in his extensive findings of fact. The judge then summed up his view of Mr. Cavers' conduct in the following manner:

> "The allegations of illegalities and improprieties against David F. Cavers, Jr., are not sufficient so as to warrant his removal as trustee. Although he wore several hats, trustee of the trust which controlled a majority of the shares in the voting stock of Chandler & Farquhar, and clerk and legal counsel to the company, no impermissible conflicts of interest emerged until 1980 when the Edinburgs became embroiled in a bitter divorce. Although Mr. Cavers could be criticized for not rigorously adhering to all the formal requirements with respect to notices of meetings, he adopted the same informal procedures followed by his predecessor trustee, Henry L. Mason, Jr. Mr. Mason was also clerk and legal counsel. Like Mr. Mason, David F. Cavers, Jr., had no reason to believe that the interests of Dorothy and Joseph Edinburg did not coincide and that they did not communicate with each other. The services which Mr. Cavers rendered in his various capacities were characterized by the independent C.P.A. who also attended most of the board of directors' meetings as more than satisfactory.

"When it became apparent that Mr. Cavers could no longer act as attorney for the situation, he took appropriate steps both to bring other counsel into the picture on behalf of the competing interests, but also to safeguard the interests of *all* the beneficiaries by remaining on as trustee. If Mr. Cavers had resigned as trustee, as Dorothy Edinburg insists, he would have put her in a position to take over immediate control of the company. In view of the circumstances, Mr. Cavers might well have subjected himself to serious criticism by, and potential liability to, the other beneficiaries. The attempt to impugn Mr. Cavers' motives and integrity by implying that he violated his duty of impartiality and favored Joseph Edinburg over Dorothy Edinburg in order to continue to receive the legal fees which his firm was paid for services (between 1972 and 1980 approximately thirty-six thousand [$36,000.00] dollars) ill becomes a person who has paid over two hundred thousand ($200,000.00) dollars for legal services in this case alone. Unfortunately, Mrs. Edinburg is so consumed by her desire to control Chandler & Farquhar that she cannot perceive her own enlightened self interest, let alone the views and interests of the other persons involved."

While not agreeing entirely with this assessment or with all of the judge's conclusions, we think, given the standard of review, see *Edinburg* v. *Edinburg, supra* at 203-204, and the standards governing removal of a fiduciary,[10] that the judge's decision to leave Mr. Cavers as a trustee should not be set aside. We proceed to discuss Dorothy's principal contentions on the removal issue.

---

[10] "A petition for removal of a trustee is addressed to the reasonable discretion of the court." *Shirk* v. *Walker,* 298 Mass. 251, 259 (1937). Consideration of such a petition "calls for careful consideration 'of all the circumstances, the existing relations, and to some extent the state of feeling between the parties.'" *Cooney* v. *Montana,* 347 Mass. 29, 38 (1964), quoting from *Scott* v. *Rand,* 118 Mass. 215, 217 (1875). This is particularly so here, where the judge's assessment of the credibility of witnesses was central to his decision. See *Gorman* v. *Stein,* 1 Mass. App. Ct. 244, 248 (1973).

(i) Dorothy makes much of Mr. Cavers' acknowledged failure to hold a formal meeting of the trustees of the DBE trust between 1972 and 1980.[11] At the outset, we note our view that all the trustees (Dorothy included) bear some responsibility for this failing. It is "the duty of each trustee to participate actively in the administration of the trust." *McMahon* v. *Krapf,* 323 Mass. 118, 128 (1948). Here, by administering the trust informally, Mr. Cavers maintained the procedure adopted by his predecessor, Mr. Mason, between 1958 and 1972. The judge's findings indicate that for twenty-two years (1958 to 1980), Dorothy displayed no visible interest in the affairs of either the trust or the company, that she effectively deferred to her husband in the conduct of both entities, and that Mr. Cavers (like Mr. Mason before him) could reasonably have believed that the interests of Joseph and Dorothy coincided to the point where it could be safely assumed that Dorothy was advised by Joseph, at least in general terms, of the condition of both the trust and the company. The evidence supports these findings, and they provide some explanation for the casual manner in which the trust's business was conducted.

"We do not mean by anything said here to encourage in any way such laxity of procedure as was adopted [by Mr. Cavers] in the instant case." *McMahon* v. *Krapf, supra* at 127-128. As long as family harmony prevailed, his neglect caused no harm. However, it is an attorney's responsibility to plan for foreseeable eventualities. Divorce, unfortunately, can be one such modern eventuality. Furthermore, as an attorney, Mr. Cavers should have recognized that the separation of legal and equitable ownership embodied in the trust was more than a mere formality. We agree with the judge that Mr. Cavers' conduct is subject to criticism as unbecoming an experienced attorney. A prudent attorney would, at the very least, have sent Dorothy notice of all meetings she was entitled to attend and would have provided her with means to indicate directly

---

[11] There were similar failures on Mr. Cavers' part. As clerk, he prepared minutes of shareholders' annual meetings that listed all shareholders as present when Dorothy had not received notice of the meeting or been in attendance. He also failed to keep certain stock records in proper order.

her acquiescence in the decisions that were being made. See 3 Scott, Trusts § 194, at 1608 (3d ed. 1967). See also *Hull* v. *Newhall,* 244 Mass. 207, 209-210 (1923). Having said that, we accept as not clearly erroneous the judge's decision that the neglect did not warrant removal. The conduct amounted to an error of judgment that caused no provable harm to the trust. See *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank,* 395 Mass. at 619 n.9. The judge could reasonably conclude that the conduct would not be repeated after his decision. See *Shirk* v. *Walker,* 298 Mass. 251, 259 (1937).

(ii) Some time in September, 1980, Mr. Cavers made inquiry of the probate department of his law firm and received a memorandum from that department that the trust required unanimous agreement by the trustees on decisions. Dorothy argues that Mr. Cavers' withholding of this opinion violated his duty to share important information with her in her capacities as a cotrustee and as life beneficiary. See Restatement (Second) of Trusts § 216 comment k (1959).

The evidence found credible by the judge does not support her contention. Mr. Cavers appears to have harbored a good faith belief that the DBE trust could operate by consensus. That belief was not unreasonable in view of some confusing language in the trust instrument which appears to speak of majority action, the relationship between Dorothy and Joseph up to 1980, and her acquiescence in the informal conduct of the trust. His request for a legal opinion when the matter was called to his attention was prudent. Moreover, Dorothy appears to have known, in August, 1980, or soon thereafter when she first raised the issue, that unanimity might be required. Thus, Dorothy, in essence, is asking that Mr. Cavers be removed for failing to provide her with information that she already possessed.[12] There is no basis for removal in this contention.

---

[12] Dorothy also argues that the judge's determination that he did not have to decide whether the trustees of the DBE trust had to act unanimously is erroneous because the trust held a majority of the company's voting shares and, therefore, any election of directors and officers made by less than all the trustees was a nullity. However, the issue is not whether the trust could act only by consensus, but whether Mr. Cavers' sanctioning of majority action compelled his removal. It did not, essentially for the reasons stated above.

(iii) Dorothy's arguments seeking Mr. Cavers' removal for his role in establishing and acting as a trustee of the trust created by Joseph on February 5, 1981, to hold the 800 shares of the company's common stock can be dealt with briefly. In setting up the trust, Mr. Cavers could properly have relied on the clear record of ownership of the stock by Joseph. See *Simon* v. *Weymouth Agricultural & Industrial Soc.*, 389 Mass. at 151. In view of that record, he was under no duty to attempt to secure this stock for the trust. There is no showing that Mr. Cavers' nominal duties as a trustee of this trust, which Joseph appears to have created as a vehicle to control the stock during his lifetime and to pass it to his children upon his death, impinged in any way on his duties as a trustee of the DBE trust.[13]

(iv) There is a series of accusations that Mr. Cavers, in his capacity as company counsel, acted adversely to the interests of the trust in (1) improperly conducting a meeting of the directors of the company on September 22, 1980, which voted to pay the dividend on the preferred stock for fiscal year 1979; (2) in allowing Joseph to participate by telephone in the meeting while he was ill in a hospital, and failing to inform Dorothy of the extent of Joseph's illness; (3) in withholding information pertaining to the company's profitability at a February 4, 1982, meeting of the trustees; (4) in failing to investigate thoroughly an allegation that Joseph had forged Dorothy's name to a document in connection with the real estate trust which owned the company's real estate; (5) in supporting the payment of bonuses to Joseph and not objecting to company charitable contributions; and (6) in allowing the company to pay Joseph's legal bills.

(a) The directors' meeting on September 22, 1980, merely continued the yearly practice of paying the dividend on the preferred stock. The meeting may have taken on added meaning in view of the legal turmoil between Joseph and Dorothy and the fact that a failure to pay the dividend would have given the preferred shareholders voting rights which might ensure

---

[13] However, we do fault Mr. Cavers for failing to disclose his role as a trustee of this trust when he was asked generally at his deposition whether he was a trustee of any other trust.

her control of the corporation. The meeting may have been held in response to Dorothy's specific complaint to Mr. Cavers on August 22, 1980, that the dividend had not been paid. These considerations, however, do not make the meeting improper. The meeting was designed to retain the status quo until such time as the disputes between the owners of the company could be resolved. Considered in that respect, the vote to pay the dividend merely preserved the principal trust asset, see *Colbert* v. *Hennessey,* 351 Mass. 131, 139 (1966), and satisfied Mr. Cavers' duty to the remainder beneficiaries. See *Dana* v. *Gring,* 374 Mass. 109, 118 (1977). As Dorothy was not a director, she was not entitled to notice of the meeting.[14] There was also a basis in the evidence for the judge to conclude that Joseph, who was hospitalized at the time, was sufficiently competent to participate in the meeting by telephone, that Joseph's failing health did not materially affect the company, and that Dorothy was able to determine independently Joseph's physical condition and need not have been told about it directly by Mr. Cavers.

(b) Inasmuch as litigation had commenced by the time of the February 4, 1982, meeting, Mr. Cavers could rely on the advice of his counsel to decline to disclose information regarding the company which was available to Dorothy from other sources. Moreover, in view of Dorothy's concession at trial that she had no reasonable expectation that the corporation would be able to pay a dividend on the common stock in the near future, the information she sought (which, she contends, was aimed at this goal) was of little practical value. There was also evidence from which it could be found that the payment of dividends on the common stock might have weakened the company's capital structure and endangered the remainder interests at a time when those interests needed special protection.

---

[14] Mr. Cavers' failure to disclose, in a letter to Dorothy's counsel on September 26, 1980, that the directors' meeting had occurred, in which he indicated that no further meetings of the trustees would take place, may have revealed a lack of tact and candor. The failure to disclose the meeting, however, did not demonstrate an unfitness to hold his position as trustee. See *Shirk* v. *Walker,* 298 Mass. at 256.

(c) We do not think that Mr. Cavers was remiss in his investigation of the forgery claim. The allegation concerned the signing of papers in connection with the 1978 dissolution of the real estate trust that owned the company's land because the trust had outlived its usefulness as a tax advantage. We think the inquiry conducted by Mr. Cavers in response to the claim could have been found by the judge to have been sufficient in the circumstances.

(d) The company's payment of legal bills on Joseph's behalf was proper. Company by-laws provided for indemnification of directors and officers for expenses incurred as a result of allegations involving their performance. The expenses charged to Joseph by his separate counsel were attributable to litigation Dorothy conducted against him in his role as an officer and director. The payment of the bills was specifically approved by an attorney who had been retained to give independent advice to the company.[15] The bonuses and charitable contributions paid by the company could also have been found by the judge to represent reasonable disbursement of company funds.

(v) Dorothy also contends that Mr. Cavers must be removed because of his hostility toward her. Some animosity may very well have existed. Dorothy accused Mr. Cavers of conduct that, if proved, would, in the judge's words, "warrant disciplinary action by the Board of Bar Overseers." However, "[t]here are many trusts in which no trustee could fully perform his duty without incurring the hostility of some of the beneficiaries." *Shirk* v. *Walker,* 298 Mass. at 260. This is one such case. Moreover, we find no evidence that any possible hostility adversely affected the administration of the DBE trust. See *Gorman* v. *Stein,* 1 Mass. App. Ct. 244, 249 (1973). We think that Dorothy has confused both hostility and partiality with a failure to acquiesce in her wishes. There is adequate support in the record for the judge's finding that "the positions [Mr.

---

[15] One bill in the amount of $3,928.95 had been paid without approval of independent counsel. There was no evidence that Mr. Cavers was aware of this bill or its payment. There is also no indication that the fees received by Mr. Cavers or his law firm were unreasonable or that these payments or others made to charities or to Joseph as bonuses damaged the DBE trust.

Cavers] took were . . . contrary to the expressed desires of Mrs. Edinburg [because of] the fact that Mrs. Edinburg's personal interests . . . were contrary to the interests of the corporation and the DBE trust." We see no basis on which to remove Mr. Cavers for alleged hostility.

Some summing up will be useful. The accumulation of charges against Mr. Cavers should not engender skepticism about the judge's decision to retain him as a trustee. To be sure, Mr. Cavers was neglectful in the manner in which he conducted meetings up to 1980 and at times he was not completely candid. However, when the trust became stalemated in 1980, as a result of the irretrievable breakdown of the marriage of Dorothy and Joseph, Mr. Cavers was the only trustee who could preserve the company while the battle between its principals went on. He might have sought instructions in August or September, 1980. With litigation a virtual certainty, however, he cannot be seriously faulted for not seeking instructions and for resolving instead to exert a stabilizing influence on the DBE trust and the company. There was no fraud or dishonesty shown. Nor was there incapacity or negligence which damaged the trust property. There was evidence from the company's independent accountant (who attended most of the directors' meetings) that the company was well managed.

Mr. Cavers has since resigned as clerk of the corporation and is no longer company counsel. He now has but one role — that of a trustee of the DBE trust. In retaining Mr. Cavers, the judge could have taken into account that Mr. Cavers' experience in his years at the company would provide a valuable resource to the two new trustees,[16] who have limited experience with the company. In the end, we think that the judge's exercise of discretion in not removing Mr. Cavers as a trustee has a reasonable basis in the record and must be respected.

---

[16] For the reasons stated in *Pinkowitz* v. *Edinburg, ante* 180, 188-190 (1986), we conclude that the judge did not err in removing Dorothy as a trustee of the DBE trust and cancelling her power to appoint successor trustees. See *Quincy Trust Co.* v. *Taylor,* 317 Mass. 195, 196-197 (1944) (past maladministration of a comparable trust is ground for removal).

5. *Damages.* Dorothy apparently concedes that the only damage that the trust could have suffered was loss of income. We find no conduct on the part of Mr. Cavers or any other defendant that might have caused any such damage. For the same reasons, the judge was also correct in rejecting her damages claim on behalf of the company. We note also that the claim was derivative in nature and that the company was not a party to the action.

6. *The G. L. c. 93A claims.* Dorothy's claims under c. 93A may be disregarded. That statute would not cover the private actions of a trustee, see *Gannett* v. *Lowell,* 16 Mass. App. Ct. 325, 328 (1983), or Mr. Cavers' conduct as a corporate officer of or legal counsel to a close corporation. See *Newton* v. *Moffie,* 13 Mass. App. Ct. 462, 469 (1982).

7. *Remaining contentions.* Dorothy's counsel has included several other claims of error in her brief. The contentions are phrased in conclusory statements or by way of adjectival comments. There is nothing in them that can be said to approach legal argument. We decline to consider the contentions. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Langlitz* v. *Board of Registration of Chiropractors,* 396 Mass. 374, 376 n.2 (1985); *Hastoupis* v. *Gargas,* 9 Mass. App. Ct. 27, 39 (1980); *A. Leo Nash Steel Corp.* v. *Southern New England Steel Erection Co.,* 9 Mass. App. Ct. 377, 385-386 (1980).

*Judgments affirmed.*